UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

———————————

No. 00-2130
(CA-99-164-R)

———————————

Jonathan Rogers,

Plaintiff - Appellee,

versus

M. L. Pendleton, etc., et al.,

Defendants - Appellants.


———————————

O R D E R

———————————


The court amends its opinion filed May 4, 2001, as follows:

On page 4, first full paragraph, line 4 -- the spelling of "Constitutional" is corrected.

For the Court - By Direction


/s/ Patricia S. Connor
Clerk

PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

JONATHAN ROGERS,
Plaintiff-Appellee,

v.

No. 00-2130

M. L. PENDLETON, Officer; M. G.
VINYARD, Officer,
Defendants-Appellants.

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
Irene M. Keeley, Chief District Judge, sitting by designation.
(CA-99-164-R)

Argued: February 26, 2001

Decided: May 4, 2001

Before WILLIAMS and MICHAEL, Circuit Judges, and
Cynthia Holcomb HALL, Senior Circuit Judge of the
United States Court of Appeals for the Ninth Circuit,
sitting by designation.

_____

Affirmed by published opinion. Judge Williams wrote the opinion, in
which Judge Michael and Senior Judge Hall joined.

_____

COUNSEL

**ARGUED:** Jim Harold Guynn, Jr., GUYNN & DILLON, P.C., Roa-
noke, Virginia, for Appellants. Randy Virlin Cargill, MAGEE, FOS-
TER, GOLDSTEIN & SAYERS, P.C., Roanoke, Virginia, for
Appellee.

**OPINION**

WILLIAMS, Circuit Judge:

Jonathan Rogers brought this action pursuant to 42 U.S.C.A. § 1983 (West 1994 & Supp. 2000) against Officers M.L. Pendleton and M.G. Vinyard of the Roanoke, Va. Police Department ("the officers"), alleging that the officers violated the Fourth Amendment to the United States Constitution by falsely arresting him, unreasonably assaulting him, falsely imprisoning him, and maliciously prosecuting him. The officers appeal from the district court's denial of their motion for summary judgment on the basis of qualified immunity. For the reasons set forth below, we affirm.

I.

In summarizing the facts in this case, we resolve all disputed factual issues in Rogers' favor, as did the district court. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994). On the evening of August 22, 1997, Rogers and his wife hosted an outdoor party for friends and family at their home, to celebrate their daughter's admission to Harvard University. The party began at about 7:30. Rogers and his wife served finger foods and had beer and wine for the adults and sodas in ice tubs for the underage guests. A family friend (a teacher and president of the local PTA) monitored the tubs containing alcoholic beverages to ensure that underage guests did not consume alcohol. A two-person band, playing amplified guitars, provided entertainment for the party. Rogers instructed the band to stop playing at 10:00 to comply with the city's noise ordinance. At 9:47, the Roanoke police dispatcher received a call complaining of a loud party in the area of Rogers' home. At 10:08, another individual called the police dispatch center complaining of loud music at a similar location. At 10:26, the dispatcher referred the report to Officers Pendleton and Vinyard. Soon after, the officers arrived on Lake Drive near Rogers' residence. Rolling his window down, Pendleton heard no music but heard the sounds of people talking at the Rogers' residence loudly enough to be heard in the road. The road leading to Rogers' driveway is a marked private road with two speed bumps. Pendleton pulled his vehicle into Rogers' circular driveway in front of the house, where he observed Rogers holding a bottle of beer. Both officers stated that they were aware that

2

they were entering Rogers' private property when they entered the driveway.

Rogers testified that he consumed one bottle of beer between 7:30 and 10:00 and had taken a sip from the beer he was holding at the time Pendleton arrived. The beer in Rogers' hand was the only alcohol the officers saw at the scene. Pendleton, however, asserted that Rogers appeared intoxicated and was "blowing alcohol fumes" in Pendleton's face.[1] (J.A. at 60, 69.)

Rogers told Pendleton that he was the owner of the property; Pendleton told Rogers that the department had received noise complaints. Rogers stated that any noise problem had ended. Officer Pendleton testified that he viewed Rogers as irreverent and intoxicated and wished to speak to someone "who was sober" regarding the noise complaint. (J.A. at 61.) Pendleton told Rogers that he intended to search the premises, whereupon Rogers asked Pendleton whether he had a search warrant and whether he had probable cause for a search. Pendleton stated that he did not need a search warrant, because Rogers was drinking in public. After stating that he owned the premises, Rogers repeatedly asked the officers to leave. During their discussion with Rogers, the officers observed persons appearing to be younger than twenty-one leaving the yard and entering the house. Pendleton testified that Rogers invaded his "personal space" and was stepping into his way, "put[ting] his face in my face." (J.A. at 61.) Pendleton then stepped around Rogers and continued to look at Rogers, who was then speaking with Vinyard. The officers then arrested Rogers for public drunkenness and impeding an officer, handcuffed him, and placed him in the back of a police cruiser. At that point, without making any further investigation on the premises, the officers took Rogers to the police station.

_____

[1] Following Rogers' arrest for public intoxication, no officer asked Rogers to conduct any sobriety test, either at the time of the arrest or at any time thereafter, and all of the charges against him eventually were dismissed.

3

II.

On March 16, 1999, Rogers filed suit against the officers pursuant to 42 U.S.C.A. § 1983 (West 1994 & Supp. 2000), alleging that the officers violated the Fourth Amendment to the United States Constitution and raising various Constitutional claims related to his arrest, including claims of false arrest, unreasonable assault, false imprisonment, and malicious prosecution. The officers denied these violations in their response to the suit and asserted that the suit was barred by, inter alia, the doctrine of qualified immunity. Following discovery, the officers moved for summary judgment, arguing that they were entitled to qualified immunity as a matter of law. The district court denied the motion on the ground that the search of Rogers' home and curtilage which the officers planned to conduct was clearly illegal, and thus Rogers was entitled to refuse to permit the search to occur. A district court's denial of qualified immunity is immediately appealable under the collateral order doctrine, because qualified immunity confers immunity from suit and not merely from liability. Mitchell v. Forsyth, 472 U.S. 511, 528-30 (1985).[2]

_____

[2] A district court's conclusion that a disputed issue of fact exists is not immediately appealable under the collateral order doctrine; instead, on an interlocutory appeal of a denial of qualified immunity, we must ask whether, assuming "all of the conduct which the District Court deemed sufficiently supported for purposes of summary judgment," the officers are, nonetheless, entitled to summary judgment as a matter of law. Behrens v. Pelletier, 516 U.S. 299, 313 (1996); see also Johnson v. Jones, 515 U.S. 304, 313 (1995) (stating that a district court's determination that the evidence at the summary judgment stage raises a genuine issue of fact is not immediately appealable). When the district court, in denying summary judgment, does not identify the specific conduct that it finds adequately supported to create a genuine issue for trial, we must "review . . . the record to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed." Behrens, 516 U.S. at 313 (quoting Johnson, 515 U.S. at 319). In determining what the district court "likely assumed," this Court "determines what the evidence [properly before the district court on summary judgment], viewed in the light most favorable to the nonmoving party, demonstrated." Winfield v. Bass, 106 F.3d 525, 535 (4th Cir. 1997) (en banc).

4

III.

A district court's denial of qualified immunity is reviewed de novo on appeal with the court using its "full knowledge of its own [and other relevant] precedents." Elder v. Holloway, 510 U.S. 510, 516 (1994) (internal quotation marks omitted and alteration in original). The Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity is not lost when an officer violates the Fourth Amendment unless a reasonable officer would know that the specific conduct at issue was impermissible. Anderson v. Creighton, 483 U.S. 635, 638-39 (1987). A "law enforcement officer who participates in a search that violates the Fourth Amendment may [not] be held personally liable for money damages if a reasonable officer could have believed that the search comported with the Fourth Amendment." Id. at 637. The Supreme Court has held that a right can be deemed clearly established even if there is no prior decision addressing the precise conduct at issue, so long as its illegality would have been evident to a reasonable officer based on existing caselaw. See Wilson v. Layne, 526 U.S. 603, 615 (1999); Anderson v. Creighton, 483 U.S. 635, 640 (1987) (stating that the precise conduct at issue need not have been held illegal for a right to be clearly established; instead, the particularity inquiry looks to whether "in the light of pre-existing law the unlawfulness [was] apparent"); cf. United States v. Lanier, 520 U.S. 259, 270-71 (1997).

Officers are not afforded protection when they are "plainly incompetent or . . . knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). But, in gray areas, where the law is unsettled or murky, qualified immunity affords protection to an officer who takes an action that is not clearly forbidden -- even if the action is later deemed wrongful. Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992). The deference given to the judgments of law enforcement officers acting in good faith is "particularly important in cases involving law enforcement officials investigating serious crimes." Porterfield v. Lott, 156 F.3d 563, 567 (4th Cir. 1998).

5

To determine whether the officers are entitled to qualified immunity, the steps are sequential: we "`must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all,'" before "`proceed[ing] to determine whether that right was clearly established at the time of the alleged violation.'" <u>Wilson</u>, 526 U.S. at 609 (quoting <u>Conn v. Gabbert</u>, 526 U.S. 286, 290 (1999)). As the precedent of the Supreme Court and this Circuit makes clear, the nature of the right allegedly violated must be defined "at a high level of particularity." <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 250-51 (4th Cir. 1999); <u>see also Anderson</u>, 483 U.S. at 639-40. Here, defined at the appropiate level of specificity, the question is whether a reasonable officer could have believed that a general search in the curtilage of a private home for evidence of a noise violation and evidence of underage alcohol consumption was permissible based solely upon reasonable suspicion. With these principles in mind, we now turn to the sole issue before us, whether the officers are entitled to summary judgment in this case on the basis of qualified immunity.

A.

The officers argue that they had the right to search the curtilage of Rogers' home based on reasonable suspicion.**3** Their claimed basis for reasonable suspicion is that (1) they had received noise complaints in the vicinity of the Rogers' home; (2) Pendleton encountered Rogers holding a bottle of beer; and (3) Pendleton observed people who appeared to be under 21 "scurrying." Thus, the officers argue that they had an adequate legal basis for conducting a search, and, therefore, their arrest of Rogers for allegedly "impeding" this search was lawful. We will first address the officers' contention that only reasonable suspicion, and not probable cause, is required to conduct a search of the curtilage of a private home. We will then address the question of whether the officers had the required level of justification to conduct the search of Rogers' curtilage which they contemplated. Finally, we will turn to the question of whether, regardless of the legality of the

_____

**3** We address here the officers' planned, but not completed, comprehensive search of Rogers' curtilage for evidence of noise and alcohol violations. Rogers also contends that the officers' entry into his driveway for the purpose of speaking to him constituted an illegal search. We address that contention in section IV <u>infra</u>.

6

officers' contemplated search, the officers had probable cause to arrest Rogers for impeding an officer and for public intoxication.

The district court held that the protection against warrantless searches of the home extends fully to the curtilage. Thus, the district court held that searches of the curtilage are permissible only when probable cause plus either a warrant or exigent circumstances exist. Id. The police officers did not have a warrant and do not contend that exigent circumstances justified their planned search. Their planned search therefore was illegal unless mere reasonable suspicion suffices to permit a search of the curtilage, and the officers in fact had reasonable suspicion.

The district court had a strong basis for its holding that probable cause is required for a search of the curtilage of a home. The Supreme Court in Oliver v. United States, 466 U.S. 170 (1984), stated that "the curtilage . . . warrants the Fourth Amendment protections that attach to the home. At common law, the curtilage is the area to which extends the intimate activity associated with the `sanctity of a man's home and the privacies of life,' . . . and therefore has been considered part of the home itself for Fourth Amendment purposes." Id. at 180 (internal citation omitted). The Court reaffirmed this position in Dunn v. United States, 480 U.S. 294 (1987), stating that "[in Oliver] we recognized that the Fourth Amendment protects the curtilage of a house and that the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." **4** Id. at 300. Thus, two relatively recent Supreme Court decisions have stated that the curtilage is entitled to the same level of Fourth Amendment protection extended to the home, so that, as with the home, probable cause, and not reasonable suspicion, is the appropriate standard for searches of the curtilage.

B.

We next address whether Rogers' right to be free from a search of the curtilage of his home premised only upon reasonable suspicion

_____

**4** The officers do not claim that the area they planned to search was outside the boundaries of the curtilage.

was clearly established at the time of the incident. Faced with the above case law, the officers attempt to argue that their planned search was permissible, or at a minimum, that the law in this area was not clearly established because some cases hold that an officer may, based upon reasonable suspicion, enter the curtilage for the purpose of approaching the home to speak to its inhabitants. By extension of that principle, the officers contend that they had the right to conduct a comprehensive search for evidence of a noise violation -- such as a band or amplifying equipment -- as well as a right to pursue evidence of underage alcohol consumption, based only upon reasonable suspicion.

In determining whether a right is clearly established, we may rely upon cases of controlling authority in the jurisdiction in question, or a "consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." Wilson, 526 U.S. at 617. While a consensus of cases of persuasive authority may clearly establish a right for qualified immunity purposes, the inverse is also true: if there are no cases of controlling authority in the jurisdiction in question, and if other appellate federal courts have split on the question of whether an asserted right exists, the right cannot be clearly established for qualified immunity purposes. See id. at 618 (noting a circuit split and stating that "[i]f judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy"). Therefore, having determined that the United States Supreme Court has, in Oliver and Dunn, established the right to be free of searches of the curtilage based merely on reasonable suspicion, we must survey the cases cited by the officers to determine whether these cases could cause a reasonable officer to believe that the search planned by the officers in this case was constitutional.

This Court's decision in Alvarez v. Montgomery County, 147 F.3d 354 (4th Cir. 1998), fails to create any doubt as to the illegality of the officers' planned search. In Alvarez, the officers received a complaint alleging underage drinking at a party, and went to the house that was the subject of the complaint. Id. at 356. When they approached the front door, the officers observed a sign stating,"Party in Back"; an arrow on the sign pointed towards the backyard. Id. at 357. The officers followed the arrow, entered the backyard, and asked to speak to

8

the owner. <u>Id.</u> While waiting to speak to the owner, the officers observed a person who appeared to be below the legal drinking age consuming a cup of beer. <u>Id.</u> After questioning the suspected under-age drinker, who produced a suspicious identification card while the officers continued to wait to speak to the owner, the officers went back to the front of the home and spoke further to the suspected underage drinker, who admitted that she was underage and stated that the party's host, knowing her age, had invited her to the party. <u>Id.</u> The officers then issued a citation to the host. <u>Id.</u> <u>Alvarez</u> stated that officers may enter a person's yard without probable cause if they have a "legitimate reason . . . unconnected with a search of [the] premises," <u>id.</u> at 358 (internal quotation marks omitted), and held that a desire to speak to the party's host was such a legitimate reason. In this case, the officers spoke to Rogers, the host, immediately, and were asked to leave. At that point, they no longer had a legitimate reason uncon-nected with a search of the premises, and the reasoning of <u>Alvarez</u> thus indicates that they would have exceeded the legitimate reasons for their entry had they proceeded to conduct a general search of the curtilage.

The Eleventh Circuit has held that "[r]easonable suspicion cannot justify the warrantless search of a house, but it can justify the agents' approaching the house to question the occupants." <u>United States v. Tobin</u>, 923 F.2d 1506, 1511 (11th Cir. 1991). The officers rely on <u>Tobin</u> for the proposition that their contemplated search of Rogers' curtilage was reasonable in light of clearly established law. Their reli-ance on <u>Tobin</u> is misplaced. First, the <u>Tobin</u> opinion cited as authority <u>Davis v. United States</u>, 327 F.2d 301 (9th Cir. 1964), in which the Ninth Circuit stated that "[a]bsent express orders from the person in possession," officers may "walk up the steps and knock on the front door of any man's `castle,' with the honest intent of asking questions of the occupant thereof." <u>Id.</u> at 303. Thus, <u>Tobin</u> itself, on which the officers rely, cites approvingly as the basis for its holding a case stat-ing that the right to approach the home and knock on its door to ques-tion the occupants is inapplicable in the presence of contrary "express orders from the person in possession." <u>Id.</u> In addition, this portion of <u>Tobin</u> is an alternative holding, because the <u>Tobin</u> court found that the presence of probable cause and exigent circumstances justified the search at issue. <u>Tobin</u>, 923 F.2d at 1511. Further, <u>Tobin</u> is factually distinguishable: after observing what appeared to be the offloading of

9

cocaine, the officers in <u>Tobin</u> simply approached the front door of the home and knocked, whereupon the inhabitants came to the door. <u>Id.</u> at 1508. The distinction between approaching a house to knock on the front door, as citizens do every day, and persisting, in the face of a request to leave by the owner of property, in a comprehensive search for sound equipment, underage drinkers and persons who might cause a noise violation to recur would seem obvious. <u>Tobin</u> did not hold, nor could it in light of the clear language of <u>Oliver</u> and <u>Dunn</u>, that general searches of the curtilage of a private home may be conducted without a warrant or exigent circumstances, based simply upon reasonable suspicion.**5**

The officers also rely upon <u>United States v. Searle</u>, 974 F.Supp. 1433 (M.D. Fla. 1997), a case in which officers received a report of gunshots from a house on a given street, and noticed only one house on the street in question with lights on. <u>Id.</u> at 1435. The officers knocked on the front door, received no answer, went around to knock on the back door, knocked, and spoke to an inhabitant who came to the door. <u>Id.</u> The <u>Searle</u> court found that probable cause and exigent circumstances supported the entry onto the curtilage of the home but held alternately that "[w]here police have a reasonable suspicion and approach a house to question the occupants thereof, their conduct does not violate the Fourth Amendment." <u>Id.</u> at 1440. <u>Searle</u>, however, fits neatly within the obvious rationale of <u>Tobin</u>: just as private citizens may approach a home, absent contrary instructions from the owner, to knock on a door, so may the police approach without probable cause, a warrant, or exigency. <u>Searle</u> clearly did not hold that, after speaking to the owner of a house and being asked to leave, officers may continue to probe the entire curtilage of a home and speak to anyone within the curtilage based merely upon reasonable suspicion.

_____

**5** We note that the officers do not claim that any exigency -- such as the need to prevent the destruction of evidence-- justified their planned warrantless search in this case. The officers do contend that Rogers was intoxicated, and thus their planned search was justified by the need to speak to a responsible adult at the party. (Brief of Appellants at 9 (stating that Officer Pendleton was simply looking for a "responsible adult at the house.")). Our discussion at § II.C.2 <u>infra</u> demonstrates that, granting Rogers the benefit of all factual disputes as we must, it is clear that a reasonable officer would not have perceived Rogers as intoxicated.

10

The officers argue that the district court "failed to recognize the right of officers to enter upon curtilage to make an investigation based on reasonable suspicion." (Reply Brief of Appellants at 3.) The district court failed to recognize this right because no such right exists; instead, the right secured by Tobin and similar cases is the right to "knock and talk," that is, to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants, not the right to make a general investigation in the curtilage based on reasonable suspicion. A contrary rule would eviscerate the principle of Oliver and Dunn that the curtilage is entitled to the same level of Fourth Amendment protection as the home itself. Indeed, the cases the officers rely upon say simply that police officers do not need a warrant to do what any private citizen may legitimately do-- approach a home to speak to the inhabitants. This is an unremarkable proposition, but it clearly fails to encompass a continued search of the curtilage for people and things after officers have spoken to the owner of a home and been asked to leave. This interpretation is buttressed by Fourth Circuit case law holding that searches of the curtilage require probable cause even without regard to the law of trespass. See United States v. Jackson, 585 F.2d 653, 660 (4th Cir. 1978) ("Of course, a search of one's home or its curtilage, effected as a result of a trespass, is an encroachment on a person's expectancy of privacy and is for that reason, but not because of the trespass, a violation of the Fourth Amendment if not based on probable cause or authorized by a search warrant." (emphasis added)). We believe that Oliver and Dunn control this case, and clearly establish that searches of the curtilage of a private home are not permitted based solely upon reasonable suspicion. Further, we do not believe that reasonable persons could read Tobin, Alvarez, and similar cases in a manner that would cast doubt on the law established in Oliver and Dunn. Thus, Rogers had a clearly established right to be free of the officers' planned search of the curtilage of his home, absent probable cause plus either a warrant or exigent circumstances. Because the officers do not claim to have had a warrant, exigent circumstances, or probable cause, it follows that their contemplated search was illegal, and it was plainly so based upon clearly established law at the time of the search.

C.

Rogers was arrested for obstruction of justice under Va. Code Ann. § 18.2-460 (Michie 1996 & Supp. 2000) and intoxication in public

11

under Va. Code Ann. § 18.2-388 (Michie 1996 & Supp. 2000). The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. An arrest is a seizure of the person, and subject to limited exceptions not relevant here, the general rule is that "Fourth Amendment seizures are `reasonable' only if based on probable cause." Dunaway v. New York, 442 U.S. 200, 213 (1979). Probable cause is "defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." Gerstein v. Pugh, 420 U.S. 103, 111 (1975) (internal quotation marks omitted and alterations in original). "Whether probable cause exists in a particular situation . . . always turns on two factors in combination: the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct." Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir. 1992). "Probable cause therefore could be lacking in a given case, and an arrestee's right violated, either because of an arresting officer's insufficient factual knowledge, or legal misunderstanding, or both." Id. If a person is arrested when no reasonable officer could believe, in light of the contours of the offense at issue, that probable cause exists to arrest that person, a violation of a clearly established Fourth Amendment right to be arrested only upon probable cause ensues. See Smith v. Reddy, 101 F.3d 351, 356 (4th Cir. 1996). Thus, the appropriate question is whether a reasonable police officer could have believed that arresting Rogers on charges of public intoxication and impeding an officer was lawful, in light of clearly established law and the information the officers possessed. Cf. Wilson, 526 U.S. at 615.

1. Obstruction of Justice

The officers contend that their arrest of Rogers was lawful because Rogers' conduct violated Va. Code Ann. § 18.2-460(A), which states that "[i]f any person without just cause knowingly obstructs a . . . law enforcement officer in the performance of his duties. . . he shall be guilty of a Class 2 misdemeanor." The key issue is whether under any reasonable interpretation of § 18.2-460(A), Rogers' actions constituted a violation of that provision. Because the probable cause inquiry is informed by the "contours of the offense" at issue, we look to Virginia cases to determine the reasonable scope of § 18.2-460(A). Pritchett, 973 F.2d at 314.

12

A Virginia appeals court has held that a defendant involved in an automobile accident who told an officer that he was too drunk to have been driving and that he did not remember who was driving did not violate § 18.2-460 because even though the statements frustrated the officer, they did not impede or resist the officer's attempts to investigate the accident. Ruckman v. Commonwealth, 505 S.E.2d 388, 389 (Va. App. 1998). A conviction for violation of the statute requires proof of "`acts clearly indicating an intention on the part of the accused to prevent the officer from performing his duty, as to `obstruct' ordinarily implies opposition or resistance by direct action. . . . It means to obstruct the officer himself not merely to oppose or impede the process with which the officer is armed.'" Ruckman, 505 S.E.2d at 389 (quoting Jones v. Commonwealth, 126 S.E. 74, 77 (Va. 1925)). Thus, like the statute considered by the Virginia Supreme Court in Jones, § 18.2-460(A) requires "actual hindrance or obstruction of the officer," "opposition or resistance by direct action." Polk v. Commonwealth, 358 S.E.2d 770, 772-73 (Va. App. 1987). "[O]bstruction of justice does not occur when a person fails to cooperate fully with an officer or when the person's conduct merely renders the officer's task more difficult" or "frustrate[s] [his or her] investigation." Ruckman, 505 S.E.2d at 389, 390.

Rogers' version of the encounter, which the district court credited for summary judgment purposes, would indicate clearly that Rogers' behavior did not obstruct the ability of the officers to conduct their planned search. While Pendleton testified that Rogers was "stepping in front of him" and "getting in his face," Pendleton also testified that he simply stepped around Rogers without difficulty and then stood without interference for a period of time while observing Rogers speaking to Vinyard. Rogers, on the district court's account of the evidence, did not make it difficult or impossible for the officers to enter the curtilage and perform their planned illegal search; the information in the record, construed favorably to Rogers, indicates that they easily could have ignored him. We thus conclude that Rogers' behavior, if indeed it was of the sort described by Rogers and implicitly credited by the district court for summary judgment purposes, see Behrens, 516 U.S. at 313, was not a violation of § 18.2-460(A), and thus Rogers was arrested without probable cause in violation of the Fourth Amendment because the "contours of the offense," Pritchett, 973 F.2d at 314, did not encompass his conduct.

13

Va. Code Ann. § 18.2-460(A) provides that if any person impedes an officer in the performance of his duties "without just cause," he shall be guilty of an offense. This language contrasts with the provisions of § 18.2-460(B) and (C), which deal with more serious obstructions "by threats or force," and contain no "without just cause" language. "Without just cause," as used in § 18.2-460(A), clearly operates to permit purely verbal resistance to a plainly unlawful search. While we conclude that Rogers' acts of purely verbal objection to the officers' planned search would not constitute obstruction regardless of the legality of their planned search, we are further cognizant of the risk that persons verbally opposing an illegal search would, on the officers' extraordinarily broad reading of § 18.2-460(A), have to walk a very fine line between granting implicit consent and objecting in a sufficiently vociferous manner as to constitute obstruction of justice. At minimum, it is clear that when a search is plainly illegal, mere verbal objection cannot constitute obstruction of justice. Thus, because Virginia's obstruction of justice statute clearly fails to encompass Rogers' behavior, we conclude that his arrest was plainly without probable cause to believe that he violated § 18.2-460(A), and thus the arrest violated his clearly established Fourth Amendment rights.

2. Public Intoxication

The officers next contend that their arrest of Rogers was lawful because he was allegedly intoxicated in public in violation of Va. Code Ann. § 18.2-388. Rogers testified that he had nothing alcoholic to drink prior to 8:00, consumed one bottle of beer between 8:00 and 10:30, and had taken one sip from the beer he was holding when Pendleton arrived at 10:30. He also testified that when the officers arrived, he was unaware of any aspects of his appearance which would have given anyone the impression that he was intoxicated. The district court's findings are not highly detailed on the question of whether, as a purely factual matter, Rogers demonstrated any signs of intoxication.[6] Viewing the evidence in the light most favorable to

_____

[6] The district court did not extensively discuss the conflicting evidence regarding this issue. However, the district court's denial of summary judgment coupled with its recitation of the evidence and statement that all factual disputes must be resolved in Rogers' favor at summary judgment lead us to conclude that we must, under Behrens v. Pelletier, 516 U.S. 299, 313 (1996), survey the record to determine the facts the district court likely assumed for summary judgment purposes.

14

Rogers, we determine that, given the substantial conflict in the evidence, the district court "likely assumed" for summary judgment purposes that Rogers neither was intoxicated at the time of his arrest nor showed any meaningful signs of intoxication. See Winfield v. Bass, 106 F.3d 525, 535 (4th Cir. 1997). This conclusion "is the factual basis upon which this court must render its decision on the purely legal issues presented." Id.

While the officers attempt to use Sigman v. Town of Chapel Hill, 161 F.3d 782 (4th Cir. 1998), as authority for the proposition that only the officers' perception of Rogers' intoxication matters legally, and thus his testimony cannot, as a matter of law, create an issue of material fact, they misread Sigman. Sigman does not stand for the proposition that the objective facts of an encounter are always legally irrelevant whenever an officer asserts that his perception of an encounter was such as to justify his action. Instead, the Sigman court addressed a situation in which officers had uncontroverted evidence of a suspect's dangerousness and knew that the suspect was armed and was behaving violently within a residence. Sigman held that the statements of persons who claimed to have observed, from a cheering mob on the other side of the street, that the suspect was unarmed did not create a triable issue of material fact where the officers closest to the encounter unanimously testified that they perceived the suspect to be armed. Id. at 787. The Sigman Court concluded that given the volatile and dangerous atmosphere and the need to make a split-second self-defense decision, the question of whether the suspect had a knife was not necessarily material to the question of whether a reasonable officer could have perceived him to be a violent threat.**7** Id. at 788 (stating, "we reject the argument that a factual dispute about whether Sigman still had his knife at the moment of the shooting is material to the question of whether Officer Riddle is entitled to" qualified immunity). Here, there was no such need to make a split-second, life or death decision; the decision to arrest someone drinking a bottle of beer in his own yard, at the end of a private road at a family social event, is simply qualitatively different from the need to decide whether to fire on a dangerous suspect approaching the police. If Rog-

_____

**7** Further, Sigman is based in part on the proposition that officers need not in all cases actually perceive a suspect to be armed before firing. See Sigman v. Town of Chapel Hill, 161 F.3d 782, 788 (4th Cir. 1998).

15

ers is correct that he had one beer within a two and one-half hour time frame, it is likely that the officers could not have perceived him to be intoxicated in public, and a jury would be entitled not to credit their testimony to the contrary. Applying Sigman in the manner urged by the officers in this case would work an unwarranted extension of a decision intended to protect officers making split-second self-defense decisions into the realm of minor public morals arrests which are manifestly unjustified if disputed factual issues are resolved in the nonmovant's favor.

Further, even if the officers could reasonably have perceived Rogers to be intoxicated, they could not have reasonably perceived him to be "in public" as required by Va. Code Ann. § 18.2-388. Rogers was standing in his private driveway, which connects to a marked, private road; Rogers owns the portion of the private road in front of his property. Rogers' seven and one-half acre residence/farm is surrounded by a wooden fence and a privacy hedge which blocks the visibility of his property from the private road; when he encountered the officers, who drove well within the boundaries of his property, Rogers could not be seen from the private road leading to his driveway, much less from any public street. A Virginia court has noted that while at the margins there is some division of authority as to what constitutes a "public place," the consensus of the extant case law from jurisdictions around the country holds that for purposes of public intoxication offenses which use language similar to Virginia's statute, a private residence where a social party is given by invitation is not a public place. See, e.g., Commonwealth v. Osterhoudt, Crim. No. 6620, 1990 WL 751049 at *1 (Va. Cir. Ct. 1990) (noting that the majority view defines a "public place" as "a place where the public has a right to go and to be," excluding "a private residence where a social party is given"); see also Royster v. State, 643 So.2d 61, 64 (Fla. Dist. Ct. App. 1994) (approvingly noting a criminal jury instruction defining a "public place" as "a place where the public has a right to be and go," and holding that the front porch of a residence is not a "public place"); Moore v. State, 634 N.E.2d 825, 827 (Ind. Ct. App. 1994) (holding that "[a] private residence, including the grounds surrounding it, is not a public place"). Thus, based upon the plain language of the Virginia statute and a consensus of decisions from other jurisdictions interpreting similar language, the officers did not have the right to arrest Rogers for public intoxication; it was clearly established at the time of

16

Rogers' arrest that by consuming alcohol in his own yard, shielded from public view, at the end of a private road, he did not commit the offense of public intoxication within the meaning of Virginia law.[8] Cf. Smith v. Reddy, 101 F.3d at 356-57. In short, we conclude that, viewing the evidence in the light most favorable to Rogers, a reasonable officer could not have perceived him to be intoxicated, and further, we conclude that it is clear that a reasonable officer could not have perceived him to be in a public place as required by the statute, and thus, on two separate grounds, the district court's denial of summary judgment based on qualified immunity on this issue must be affirmed.

IV.

In addition to his false arrest and false imprisonment claims, which are essentially claims alleging a seizure of the person in violation of the Fourth Amendment, Rogers brings a malicious prosecution claim and a claim alleging that the officers' entry into his driveway for the purpose of speaking to him constitutued an illegal search. Rogers' malicious prosecution claim is so intertwined legally with his false arrest claim as to stand or fall with that claim for qualified immunity purposes. See Lambert v. Williams, 223 F.3d 257, 261-62 (4th Cir. 2000), cert. denied, 121 S.Ct. 889 (2001) (stating that "there is no such thing as a § 1983 `malicious prosecution' claim. What we term[] a `malicious prosecution' claim . . . is simply a claim founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution-- specifically, the requirement that the prior proceeding terminate favorably to the plaintiff. It is not an independent cause of action." (internal citation omitted)). We conclude that this claim is wholly derivative of the false arrest claim for qualified immunity purposes and thus do not analyze it separately.

_____

[8] We do not contend that the precise boundaries of the meaning of "in public" for purposes of Va. Code Ann. § 18.2-388 are settled in Virginia law. We conclude only that wherever the precise line between public and private may reasonably be drawn, on these facts-- involving not merely a private residence but a private residence at the end of a private road and surrounded by tall hedges and a fence -- Rogers was clearly on the private side of the line.

17

Rogers also claims that the officers conducted an unlawful search when they pulled into his driveway in order to speak to him regarding the noise violation. The cases cited by the officers for the "knock and talk" rule, while inapplicable to their planned comprehensive search of Rogers' curtilage after he asked them to leave, find their proper application relative to this claim. The officers had a right, based on reasonable suspicion, to approach Rogers' home in order to speak to him regarding the noise complaints. Their error is in converting this limited license to do what any citizen may do -- approach the house and speak to the inhabitant or owner -- into a license to search for "evidence" and speak to various guests at a party after speaking to Rogers and being asked to leave. In anything more than a de minimis sense, however, they did not in fact search Rogers' curtilage after being asked to leave; instead, after Rogers asked them to leave, they arrested him and left. The actual "search" conducted by the officers thus did not violate the Constitution, for the reasons stated in Alvarez. Alvarez v. Montgomery County, 147 F.3d 354, 358 (4th Cir. 1998).

As regards their planned search of the curtilage for evidence of alcohol and noise violations, which they did not in fact conduct, the officers are correct that if the district court had found that they violated the Constitution by committing an "attempted wrongful search," the district court would have erred. However, we do not read the district court to have found such an independent violation; instead, the district court appears to have correctly found that the wrongfulness of the officers' contemplated search was relevant to the wrongful arrest claim, since Rogers' arrest for verbally obstructing an officer is inextricably intertwined with his refusal to consent to, and his decision to complain about, a search that would have been illegal if performed without his consent. At root, this is a false arrest and false imprisonment case.

V.

In examining each constituent part of the officers' qualified immunity claim, we do not lose sight of the possible inference from the evidence that Rogers' arrest was motivated by the officers' anger at his "irreverent" refusal to consent to their search. In short, crediting Rogers' version of disputed factual issues, as we must, it appears that this may not be a case in which police officers acting in good faith made

18

a "bad guess" in a confusing area of the law, but instead, may be a case in which police officers, angered by a homeowner's correct statement of his legal rights and refusal to permit a search which was clearly illegal absent his consent, arrested a homeowner in a fit of pique. The officers now seek to justify their arrest with an implausible reading of cases establishing a simple right to approach a home to speak to the owner without a warrant, assertions that verbal objection to an illegal search is an independently arrestable offense, and claims that a suspect was intoxicated in public when it is disputed whether he was intoxicated and the clear evidence indicates that he was not in public. The police do not have a right to arrest citizens for refusing to consent to an illegal search. The decision of the district court is therefore affirmed.

AFFIRMED