BENTON, J.,
dissenting.
“[A] search or seizure carried out on ... [residential] premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of ‘exigent circumstances.’ ” Coolidge v. New Hampshire, 403 U.S. 443, 474-75, 91 S.Ct. 2022, 2043, 29 L.Ed.2d 564 (1971). See also Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 515, 19 L.Ed.2d 576 (1967). This principle applies to entries and searches within “the curtilage ... [, which] has been considered part of the home itself for Fourth Amendment purposes.” Oliver v. United States, 466 U.S. 170, 180, 104 S.Ct. 1735, 1743, 80 L.Ed.2d 214 (1984). Thus, the Robinsons’ driveway, a part of their home’s curtilage, was a place where they could “legitimately demand privacy” from illegitimate police intrusion. Id. at 178, 104 S.Ct. at 1748. The Commonwealth failed to prove that police officers’ warrantless entry and search onto the curtilage of the Robinsons’ residence falls within the “jealously and carefully drawn” exceptions to the Fourth Amendment’s warrant requirement. Jones v. United States, 357 U.S. 493, 499, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958).
No evidence in this record establishes that the police officers went to the Robinsons’ residence to “knock and talk.” The evidence proved that Sergeant Allen of the Albemarle Police Department “was ... placed in charge of a potential investigation of an underage drinking party.” At his direction, Officer Scott Cox, a corporal, went to the property at 11:00 p.m. to “investigate” the party without any plan to first go to the front door to make inquiries. Indeed, the trial judge found that Officer Cox “planned to enter the property to investigate the allegations of underage consumption of alcohol.”
*569 Officer Cox testified about the plan the officers prepared before going to the residence. In response to the prosecutor’s questions, Officer Cox explained the plan:
Q: And what was the plan? You were going to go onto the property, and then what was going to happen?
A: I was just going to take the investigation further.
He further testified that “Sergeant Allen suggested that [Officer Cox] go first to investigate” while other police officers remained in their vehicles a half mile away, waiting for information from him. Officer Cox did not testify that the plan included an inquiry at the front door of the residence. Indeed, the facts patently establish that was not part of the plan. When Officer Cox drove toward the residence and was still on the public highway, he saw cars in the driveway, “got on the radio and ... said [to the other waiting officers], ‘Please start heading this way. It appears there’s a party.’ ” At that point, he had seen no juveniles drinking alcohol. Nor had he seen any people at the residence.
Officer Cox then drove up the driveway “to investigate further,” explaining his plan as follows:
Q: Isn’t it correct that you have described the situation you were hoping to observe as the effect when you flick on a light in a dark kitchen, and the cockroaches scatter?
A: Right.
Q: So you were looking for a reaction of people scattering to confirm your suspicion that you had an underage drinking party.
A: Right.
Q: Officer Cox, isn’t it true that it was not your intent to walk to the front door and knock on it, as you proceeded up that driveway that night?
A: My intent when I drove up the driveway was to establish probable cause, to investigate the scene further.
*570 When Officer Cox saw “two people that appeared to be juveniles” holding beer bottles in the backyard, he continued to drive past the walkway that led to the front door and stopped his vehicle “as far back on the asphalt as [he] possibly could.” Officer Cox stopped at a place from which he could see into the backyard. He testified he “wanted to identify [the two people], to find out what their age was, and to see if it was alcohol.” Officer Cox testified that when the two people dropped the bottles and scattered, his suspicion about who they were and what they were holding caused him to believe it was probable that they were underage and drinking alcohol. When he exited his vehicle, he “got on the radio, and ... told everybody ... that the kids were running east ... into the woods.” He then went into the backyard as the “backup [officers] were coming to assist” because he “was looking for the juvenile hosting the party.”
The sergeant’s plan of action and Officer Cox’s conduct on the driveway all establish that they were not there to “knock and talk” and that they went beyond any implied invitation to be on the property. “[N]o ... right exists” for a police officer to enter upon the curtilage of a person’s home to conduct an investigation merely because the officer had a reasonable suspicion of criminal activity. Rogers v. Pendleton, 249 F.3d 279, 289 (4th Cir.2001). Although the police officer may walk to the front door of a residence to knock and speak to a resident, limitations exist upon the officer’s conduct. Id.[18]
*571 [T]he right to “knock and talk,” that is, to knock on a residence’s door or otherwise approach the residence seeking to speak to the inhabitants, [is] not the right to make a general investigation in the curtilage based on reasonable suspicion. A contrary rule would eviscerate the principle ... that the curtilage is entitled to the same level of Fourth Amendment protection as the home itself.

Id.

Simply put, the government failed to meet its “heavy burden” to show this was one of the few and carefully delineated exceptions to the warrant requirement. Welsh v. Wisconsin, 466 U.S. 740, 749, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984). Officer Cox was not sent to make an inquiry at the front door, and he never approached the front door. Acting on a reasonable suspicion, he drove onto the curtilage “to investigate the scene further.” The plan the sergeant devised involved Officer Cox entering the curtilage “to establish probable cause” to charge the occupants with a crime. Officer Cox’s conduct was consistent with that plan.
The distinction between approaching a house to knock on the front door, as citizens do every day, and persisting ... in a comprehensive search for ... underage drinkers ... would seem obvious____[G]eneral searches of the curtilage of a private home may [not] be conducted without a warrant or exigent circumstances, based simply upon reasonable suspicion.
Rogers, 249 F.3d at 289.
For these reasons, and for the reasons more fully discussed in Judge Elder’s dissent to the majority opinion and Judge Annunziata’s dissent to the panel’s opinion, see Robinson v. Commonwealth, 45 Va.App. 592, 622-32, 612 S.E.2d 751, 765-71 (2005), I would hold that the police officers’ entry and search was violative of the Fourth Amendment.

. Obviously, the occupants of a residence have not issued an implied invitation to the public to enter the premises to search or rummage around or to engage in illegitimate conduct.
A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant. Of course, this does not mean that, whenever entry is obtained by invitation ... an agent is authorized to conduct a general search for incriminating materials.
Lewis v. United States, 385 U.S. 206, 211, 87 S.Ct. 424, 428, 17 L.Ed.2d 312 (1966). Thus, when, as here, an officer enters the curtilage "to establish probable cause to investigate the scene further,” his intrusion does not fall within the property owner’s implied invitation to the public. See Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 329, 99 S.Ct. *571 2319, 2326, 60 L.Ed.2d 920 (1979) (holding that "there is no basis for the notion that because a [property owner] invites the public to enter, it consents to wholesale searches and seizures that do not conform to Fourth Amendment guarantees").