# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

ROMIE R. EDENS, JR.,
       *Plaintiff-Appellant,*

v.

GEORGE L. KENNEDY, individually
and/or in his capacity as a Senior
Trooper for the West Virginia State
Police,
       *Defendant-Appellee.*

No. 03-2108

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
Charles H. Haden II, District Judge.
(CA-01-933-2)

Argued: May 4, 2004

Decided: August 4, 2004

Before WILKINS, Chief Judge, MOTZ, Circuit Judge, and
C. Arlen BEAM, Senior Circuit Judge of the
United States Court of Appeals for the Eighth Circuit,
sitting by designation.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Peter Michael Suwak, Washington, Pennsylvania, for
Appellant. Michael Deering Mullins, STEPTOE & JOHNSON,

Charleston, West Virginia, for Appellee. **ON BRIEF:** Ancil G. Ramey, Jeffrey K. Phillips, STEPTOE & JOHNSON, Charleston, West Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

This appeal arises from a suit filed by Appellant Romie R. Edens, Jr. pursuant to 42 U.S.C.A. § 1983 (West 2003). Edens alleges that Appellee George L. Kennedy, a West Virginia State Trooper, twice violated Edens' Fourth Amendment rights by trespassing on his property, once with no warrant and once with an invalid warrant. Edens further alleges that Kennedy chilled Edens' exercise of First Amendment rights by filing a report accusing him of illegal activities after he told a reporter about Kennedy's alleged misconduct.

The district court granted summary judgment to Kennedy on all claims. We affirm.

### I.  *Introduction*

The facts of this case are intensely disputed. In general, Edens alleges that Kennedy violated his constitutional rights as a result of Kennedy's association with Carney Wright, a neighbor of Edens' who works for the local prosecutor; Wright has had a long-running dispute with Edens stemming from an attack by Wright's dog against Edens' wife's dog. Kennedy replies that he does not know Wright and that his actions were normal police practices that did not infringe Edens' rights. More detailed descriptions of the evidence will accompany the discussion of each of Edens' claims.

On appeal from the grant of summary judgment, we view the evidence in the light most favorable to Edens, the nonmoving party. *See*

*Figgie Int'l, Inc. v. Destileria Serralles, Inc.*, 190 F.3d 252, 255 (4th Cir. 1999). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Our review is de novo. *See Edelman v. Lynchburg College*, 300 F.3d 400, 404 (4th Cir. 2002).

Also relevant in this appeal is the doctrine of qualified immunity, which shields government officials from liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (internal quotation marks omitted). "A court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Id.* (internal quotation marks omitted).

## II.   *Kennedy's First Entry onto Edens' Property*

On October 6, 1999, Kennedy obtained a search warrant for Edens' home. In his warrant application, Kennedy alleged that he had seized marijuana plants from Edens' front doorstep earlier that day. Edens alleges that the entry onto his property described in the warrant application was unconstitutional. We hold that this entry may have been unlawful but that Kennedy is entitled to qualified immunity. Accordingly, we affirm the entry of summary judgment against Edens on this claim.

### A.   *Facts*

Edens' house is located on a narrow, rural road. There is a fence around the front, back, and left side of the house (as one faces the front of the house); on the right side of the house, there is no fence, but the lot is densely wooded. The fence does not obscure the view of the home from the road, both because its rails are separated by wide gaps (as are the fenceposts) and because the house is located on a hill.

Where the fence crosses the driveway, to the left of the house, there is a gate wide enough to admit a vehicle. The gate is kept locked, and the fencepost next to the gate is marked with a sign that Edens characterized as a "No Trespassing" sign. J.A. 160a. Edens also testified that several other "No Trespassing" signs are displayed on his property. Edens acknowledged, however, that his signs frequently fall down. Kennedy testified that when he went to Edens' house he saw that the gate was locked but did not notice any "No Trespassing" signs.

The fence in front of the house is not quite flush with the woods to the right of the house. Instead, there is a gap approximately four feet wide between the fence and woods; this gap is near the road that runs in front of Edens' home. Edens attempts to cover this gap with a wooden pallet in order to prevent the escape of cattle he keeps on his property, but the pallet often falls over. According to his deposition testimony, Kennedy entered the property through the gap between the fence and the woods. He could not recall seeing the pallet at the time.

Kennedy testified that he went to Edens' house in response to an anonymous tip. According to Kennedy, the tipster said that

> he worked for the power company and that he had installed a meter base or a meter box . . . at a place the day prior and that he'd seen marijuana plants . . . outside the residence or in portable pots, something of that nature.
>
> . . . .
>
> He then went into detail that . . . several marijuana plants . . . were in portable containers outside the residence. And then he went on to say that he actually knew the homeowner and that the homeowner was growing them indoors and was carrying them outside during the day for sunlight . . . .

*Id.* at 345a-46a. The tipster also provided Kennedy with Edens' address and a description of his house.

Kennedy recounted at his deposition that he and another officer, Donald Frye, responded to this tip by going to the address provided

by the tipster. After confirming that the property matched the tipster's description, Kennedy parked his vehicle by the side of the road. While Frye waited in the vehicle, Kennedy walked through the gap between the fence and the woods and went to the front door of the house to "talk to the homeowner." *Id.* at 370a. Acknowledging that he did not have probable cause at that time, Kennedy said his intent was to ask the homeowner for consent to search the home.

When Kennedy got to the front door, he saw a flowerpot containing five or six marijuana plants. After finding this flowerpot, he knocked on the front door but got no response. He then went to the back and knocked on the door there, but he again received no response. While in back of the house, Kennedy did not see the marijuana plants that had been described by the tipster. He did, however, observe that the windows of the home were covered with plywood, which he was aware was a common practice among marijuana growers. According to his testimony, Kennedy left the premises after receiving no answer to his knocks, taking the flowerpot and its contents with him.[1]

## B. *Analysis*

Edens claims that the entry onto his property was unlawful because (1) Kennedy should have investigated the tip more thoroughly before intruding on Edens' property; (2) Kennedy's entry to "talk to the homeowner" was really a pretext for searching the curtilage around Edens' home; and (3) even if Kennedy genuinely intended to knock and ask permission to search the interior of the home, rather than to search the exterior without consent, the entry onto Edens' property was impermissible in light of Edens' clear intent to exclude strangers from his premises. We hold that the district court properly granted summary judgment on these claims.

---

[1]Kennedy testified that he brought the flowerpot back to his office, submitted its contents for testing, and discarded the pot itself. One lingering question about this pot concerns its color: Kennedy described it as "lime green" in his search warrant affidavit, *id.* at 861a; then said in a subsequent report that it was "blue in color," *id.* at 948a; and then testified in his deposition that "the color of the flower pot was actually a bluish-green, lime green. It was turquoise. I don't know." *Id.* at 370a-71a. Edens mentions these matters in his brief but apparently does not rely on them to support any of his appellate claims.

Before addressing Edens' individual arguments, we note that Edens has questioned whether the initial entry onto his property even occurred. His allegations, if true, would lend considerable support to the Fourth Amendment claim discussed in Part III but would obliterate this claim. We will therefore assume for purposes of this claim that Kennedy in fact went to Edens' house and walked on Edens' property before obtaining a search warrant. We will discuss Edens' allegations to the contrary in Part III.

1.

Edens urges that Kennedy could have evaluated the veracity of the anonymous tip without encroaching on Edens' property—for example, by checking whether the power company had in fact serviced Edens' home or by conducting a helicopter flyover of the property (which was done by Frye after he and Kennedy visited Edens' property). The Fourth Amendment, however, does not require police officers to employ the "least intrusive means" of conducting their investigations. *Bd. of Educ. v. Earls*, 536 U.S. 822, 837 (2002). Thus, if it was otherwise lawful for Kennedy to enter Edens' premises, the fact that he could have followed up on the tip in some other manner does not render the entry unconstitutional.

2.

Edens' second argument derives from the limitations on so-called "knock and talk" investigations. We have held that, ordinarily, no Fourth Amendment violation occurs when the police "knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants." *Rogers v. Pendleton*, 249 F.3d 279, 289 (4th Cir. 2001); *see Alvarez v. Montgomery County*, 147 F.3d 354, 357 (4th Cir. 1998) ("[P]olice may approach a building, including the front entranceway to a residential dwelling, without committing a search where a person lacks a reasonable expectation of privacy in the area."). Furthermore, the police may circle to the back of the home under appropriate circumstances. *See Alvarez*, 147 F.3d at 358. The police may not, however, conduct a full search of the curtilage without a warrant or another justification that would be sufficient for entry into the home itself. *See Rogers*, 249 F.3d at 287, 289.

Edens contends that Kennedy's entry onto his property was unlawful because the purpose was to search the curtilage. But Kennedy's purpose is irrelevant. Edens has offered no evidence that Kennedy conducted a general search of the curtilage or otherwise strayed from the areas a police officer is ordinarily permitted to enter. To the extent that Kennedy would ordinarily have been permitted to enter the curtilage and knock on the front and back doors of Edens' home, his authority to do so was not impaired by his receipt of a tip stating that there might be evidence of criminal activity behind Edens' house. *See United States v. Villamonte-Marquez*, 462 U.S. 579, 584 n.3 (1983).

3.

Edens' final argument with respect to this claim is that his clear declaration of his intent to exclude strangers from his property rendered any "knock and talk" unlawful, regardless of Kennedy's motivation. We hold that Kennedy's entry onto Edens' property may have violated the Fourth Amendment but that Kennedy was nevertheless entitled to summary judgment on qualified immunity grounds.

Our analysis begins with the precept that the curtilage is entitled to the same Fourth Amendment protection as the home. *See Oliver v. United States*, 466 U.S. 170, 180 (1984); *Rogers*, 249 F.3d at 287. This does not mean, however, that limits on access to the home and the curtilage are equivalent. Access to the home is strictly forbidden in the absence of a warrant or exigent circumstances. *See Payton v. New York*, 445 U.S. 573, 590 (1980). In contrast, police officers ordinarily may enter the curtilage in order to approach the home without implicating the constraints of the Fourth Amendment. *See Alvarez*, 147 F.3d at 357.

We hold, however, that if the owner of a home encloses the curtilage with a fence, locks the gate, and posts "No Trespassing" signs, the effect for Fourth Amendment purposes is to extend the walls of the home to the edge of the curtilage. This is because the act of sealing the property creates an elevated expectation of privacy. *Cf. California v. Ciraolo*, 476 U.S. 207, 211 (1986) ("The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'" (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)));

*Alvarez*, 147 F.3d at 357 (discussing reasonable expectations of privacy with respect to curtilage).

In the absence of a fence with a locked gate, a homeowner is likely to receive visits from pollsters, door-to-door salespeople, and trick-or-treaters, among others. There is no constitutional basis for excluding police officers from this list of potential visitors. *See Rogers*, 249 F.3d at 289-90 ("[P]olice officers do not need a warrant to do what any private citizen may legitimately do—approach a home to speak to the inhabitants."). Nevertheless, the homeowner can reasonably expect all such visits to cease when he has manifested his intent to exclude strangers by sealing the property around his home and posting "No Trespassing" signs. Thus, in the absence of a warrant or exigent circumstances, a police officer may not lawfully breach a locked enclosure around the curtilage. *See State v. Brocuglio*, 779 A.2d 793, 800 (Conn. App. Ct. 2001) (holding that police violated Fourth Amendment by entering backyard enclosed by stockade fence posted with "No Trespassing" and "Keep Out" signs), *aff'd*, 826 A.2d 145 (Conn. 2003); *State v. Ridgway*, 790 P.2d 1263, 1265 (Wash. Ct. App. 1990) (holding that marijuana recovered from doorstep was subject to suppression because police observed marijuana only after walking around closed gate across driveway and evading guard dogs while approaching house).

We emphasize that our holding is a narrow one. In particular, we do not hold that all enclosed areas are off limits to the police. An enclosed area outside the curtilage may be subject to warrantless intrusions even if the owner has posted "No Trespassing" signs. *See Oliver*, 466 U.S. at 176-84 (holding that the Fourth Amendment did not apply to searches conducted in enclosed areas remote from the defendants' homes). And, even within the curtilage, the police may traverse a fence if there is no clear indication that the homeowner intended to exclude uninvited visitors. For example, in *Rogers*, we upheld an entry into the curtilage for the purpose of conducting a "knock and talk" even though the property in question was surrounded by a fence and a privacy hedge. *See Rogers*, 249 F.3d at 293, 294. But if a fence within or around the curtilage is locked and posted with signs in order to prevent access, this "manifest[s] an objective intent that the area be preserved as private." *Brocuglio*, 779 A.2d at 800. When such intent would be apparent to a reasonable officer, the

police may not enter the enclosed area without a warrant or exigent circumstances.

It may be that no such intent was apparent here, despite the locked gate and the "No Trespassing" signs, because the gap between Edens' fence and the woods next to his house permitted relatively easy access to his front yard. We need not resolve that question, however, because Kennedy is entitled to qualified immunity even if Edens' intent to exclude uninvited visitors was plain.

We have found only one case decided before October 6, 1999 (the date of the intrusion at issue here) that squarely supports Edens' claim. *See generally State v. Ridgway*, 790 P.2d 1263 (Wash. Ct. App. 1990). *Ridgway* was decided by an intermediate court in Washington State, and it therefore did not create clearly established law of which a reasonable officer in West Virginia should have been aware. *See Wilson v. Kittoe*, 337 F.3d 392, 402-03 (4th Cir. 2003) ("In determining whether a right was clearly established at the time of the claimed violation, courts in this circuit ordinarily need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose." (alteration and internal quotation marks omitted)). Moreover, *Ridgway* stands in contrast to numerous cases upholding the entry of police officers into areas enclosed by fences or marked with "No Trespassing" signs. *See* Vanessa Rownaghi, Comment, *Driving into Unreasonableness: The Driveway, the Curtilage, and Reasonable Expectations of Privacy*, 11 Am. U. J. Gender Soc. Pol'y & L. 1165, 1183-85 (2003) (discussing cases). Although those cases are factually distinguishable, and thus do not preclude us from reaching the holding we have announced today, they do not support Edens' claim either. Accordingly, although Kennedy's entry on Edens' property may have violated the Fourth Amendment, Kennedy is entitled to qualified immunity. We therefore uphold the entry of summary judgment on Edens' claim arising from the first intrusion onto his property.

### III. *Kennedy's Second Entry onto Edens' Property*

On October 6, 1999, Kennedy went to Edens' home with a search warrant and searched the premises, including the interior of the house.

He did not find any evidence of marijuana use or cultivation. Edens claims that this search was unlawful.

"When an officer acts pursuant to a warrant, the pertinent question is whether the officer could have reasonably thought there was probable cause to seek the warrant." *Smith v. Reddy*, 101 F.3d 351, 356 (4th Cir. 1996). Edens contends that such a belief was unreasonable here because (a) Kennedy never actually went to Edens' home before requesting a search warrant, so the averments in his warrant application—which depended heavily on his observations during the first entry—were all false; and (b) the tip that induced Kennedy to make the search was verifiably false. Edens further contends that, even if probable cause existed, the warrant here was invalid because the magistrate's signature was forged. We affirm the entry of summary judgment as to each of these issues.

### A.   *Alleged Misrepresentations about Previous Observations*

In his application for a search warrant, Kennedy relied on observations purportedly made at Edens' home earlier that day (during the entry discussed above in Part II). Edens alleges that Kennedy's description of the first entry is not credible for four different reasons. We find these considerations insufficient to create a material question of fact about whether the first entry occurred.

*First*, Edens claims that Kennedy's deposition testimony that Trooper Frye accompanied him during the first entry is contradicted by a police report drafted by Kennedy in which he consistently referred to "this officer" in the singular. *E.g.*, J.A. 947a ("After obtaining the information from the anonymous caller, this officer then traveled to . . . the suspect's residence . . . ."). We question whether the use of "this officer" proves that only one officer was present, particularly in light of the limited role attributed to Frye in Kennedy's deposition (as well as Frye's). In any event, this alleged discrepancy in no way suggests that Kennedy did not visit Edens' home at all before obtaining a search warrant; it merely raises the question of whether Kennedy traveled alone or with another officer.

*Second*, Edens asserts that photographs allegedly taken by Kennedy during his first visit to Edens' home were shot in the afternoon. This is significant because it is undisputed that the search pursuant to the warrant occurred around 1:30 p.m.; thus, if Kennedy's first entry onto Edens' property occurred at all, it must have occurred in the morning or very early afternoon, in light of the tasks that Kennedy had to complete in order to obtain a search warrant. An expert hired by Edens, Ralph Bouwmeester, concluded that shadows in Kennedy's photographs prove that the photos could not have been taken at any time on October 6, 1999, and instead must have been taken around 2 p.m. on October 17, 1999, or February 24, 2000 (or perhaps on those same dates during other years). Bouwmeester's report was not admissible on summary judgment, however, as it was unsworn and was not accompanied by an affidavit affirming its authenticity.[2] *See Scott v. Edinburg*, 346 F.3d 752, 759 (7th Cir. 2003); *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 1000 (5th Cir. 2001).

*Third*, Edens notes that the flowerpot allegedly seized during the first entry was listed on the property receipt that Kennedy prepared later when he executed the warrant. Kennedy testified at his deposition that he put the flowerpot on the warrant receipt, rather than on a separate property receipt, because the seizure occurred the same day as the search and "[t]he time was irrelevant." J.A. 486a. On summary judgment, however, we are constrained to disregard this testimony and draw the inference proposed by Edens—namely, that Kennedy did not seize the flowerpot until he executed the warrant. This may show that he *never saw* the pot until that moment, as Edens contends, but it is equally plausible that Kennedy *saw* the pot during the first entry but did not *seize* it until his return to the premises a few hours

---

[2]Kennedy asserts that even if the Bouwmeester report was properly admitted on summary judgment, this court may not consider it because it does not appear in the joint appendix. We are permitted, however, to rely on material in the record that is not included in the appendix. *See* Fed. R. App. P. 30(a)(2). We also direct counsel's attention to Fourth Circuit Rule 30(c), which states, "Notwithstanding that FRAP 30 provides that the appellant shall prepare and file the appendix, the Court considers the coordination of preparing the appendix to be the responsibility of both sides. The failure of a side to designate does not absolve the other side from the responsibility."

later. There is no evidence in the record that would allow a jury to choose the former inference over the latter without engaging in speculation. We therefore conclude that the inclusion of the flowerpot on the property receipt does not give rise to a material dispute of fact about whether the first entry occurred.

*Fourth*, Edens contends that a log of radio communications between Kennedy and the dispatcher lists only one visit to Edens' home, around the time of the execution of the search warrant. Edens asserts that the absence of any reference to an earlier visit proves that the first entry never occurred. But neither the log itself nor Kennedy's deposition testimony about his procedures establishes that Kennedy reports all of his movements to the dispatcher. Accordingly, we conclude that the evidence relied upon by Edens does not conflict with Kennedy's claim that he visited Edens' property before seeking a search warrant.

### B.  *Alleged Falsehoods in the Anonymous Tip*

Edens further asserts that even if the first entry occurred, there was no probable cause for a search because the information provided by the anonymous tip had been or could have been proven false. We disagree.

Edens initially maintains that the tipster's description of 50 marijuana plants behind the house was disproven when Kennedy went to the house and knocked on the back door, and again when Frye conducted the helicopter flyover. We agree that the failure to discover marijuana plants behind Edens' house undermined the tipster's reliability to some extent, as the tipster told Kennedy that "the homeowner was growing them indoors and was carrying them outside during the day for sunlight." J.A. 346a. But Kennedy was not required to infer from this tip that the homeowner took his plants outside *every day*. Consequently, the fact that there were no marijuana plants behind the house did not prove that the information from the tipster was false.

Edens also asserts that his meter box was installed in 1998, not on October 5, 1999 (the date indicated by the tipster). Even if this is true, however, there is no evidence in the record that the power company

would have been willing to disclose this information to the police. Accordingly, Edens has not established that Kennedy could have investigated the veracity of the anonymous tip without searching the premises.

In any event, the warrant was supported by probable cause even if information available to Kennedy had substantially undermined the reliability of the tip. During the first entry, Kennedy personally observed marijuana plants on the doorstep and boards over the windows—and, as we have discussed, nothing in the record discredits his claim that those observations were made. These observations were sufficient in themselves to support the issuance of a warrant. *See United States v. Malin*, 908 F.2d 163, 165-66 (7th Cir. 1990) (holding that observation of marijuana plants in backyard sufficed to establish probable cause for search of home), *abrogation on other grounds recognized in United States v. Monroe*, 73 F.3d 129 (7th Cir. 1995); *People v. Pannebaker*, 714 P.2d 904, 907-08 (Colo. 1986) (en banc) (noting that coverings on windows provided evidence of marijuana cultivation). Thus, by the time Kennedy sought a warrant, the reliability of the tip was moot.

C.  *Alleged Forgery of the Magistrate's Signature*

1.

The affidavit that Kennedy prepared to support his search warrant application bears the signature of Magistrate Traci L. Carper, affirming that the affidavit was "subscribed and sworn" in her presence. J.A. 860a. The search warrant issued upon that affidavit also bears Magistrate Carper's signature. Edens commissioned a forensic documents examiner, James Blanco, to determine whether these signatures ("the questioned signatures") were authentic. After comparing the questioned signatures to signatures on other court documents ostensibly signed by Magistrate Carper ("the known signatures"), Blanco determined that the questioned signatures were forged.

Edens submitted Blanco's report to the district court along with other exhibits appended to Edens' answer to Kennedy's summary judgment motion. The district court refused to consider this report, however. The court reasoned that Blanco's conclusion was premised

on "an error of logic" in light of Magistrate Carper's testimony at her deposition that she had signed the affidavit and the search warrant. *Id.* at 981a. The court further noted that Blanco's report was not accompanied by an affidavit or otherwise substantiated by sworn declarations.[3]

We cannot accept the first rationale employed by the district court. At her deposition, Magistrate Carper testified that both of the questioned signatures and seven of the eight known signatures were hers. (The eighth signature exemplar was not shown to her.) The district court apparently believed it was illogical for Blanco to accept Magistrate Carper's confirmation of the known signatures while disregarding her testimony concerning the questioned signatures. The jury, however, would be permitted to make such a determination, and we must give effect to this possibility on summary judgment.[4]

Nevertheless, the grant of summary judgment was proper in light of the second ground noted by the district court. As discussed above, unsworn reports are inadmissible on summary judgment unless accompanied by affidavits or depositions swearing to their contents and conclusions. Thus, the district court properly refused to consider the Blanco report.

2.

After the entry of summary judgment, Edens moved for reconsider-

---

[3]The district court did not question, nor do we, that the search of Edens' home was unlawful if the magistrate's signature on the warrant was in fact forged. This is so regardless of whether the warrant application established probable cause for the search. *Cf. Groh v. Ramirez*, 124 S. Ct. 1284, 1289-90 (2004) (holding that search based on invalid warrant is unlawful even if warrant application establishes probable cause and adequately particularizes places to be searched).

[4]Kennedy notes that Blanco admitted that it was possible the questioned signatures were Magistrate Carper's. Blanco also acknowledged certain similarities between the questioned signatures and the known signatures and conceded that litigants can procure experts for any conclusion they desire. To the extent these statements raised questions about Blanco's credibility, the district court was obligated to resolve those questions in favor of Edens.

ation pursuant to Federal Rule of Civil Procedure 59(e). Appended to this motion was a transcript of Blanco's deposition, in which he affirmed his authorship of the report and attested to its contents. Edens asserted that this new document cured any technical defect in the admissibility of Blanco's report. The district court denied Edens' motion.

"There are three circumstances in which the district court can grant a Rule 59(e) motion: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 290 (4th Cir. 2002) (internal quotation marks omitted), *cert. denied*, 538 U.S. 1012 (2003). We review a decision denying reconsideration for abuse of discretion. *See id.*

We find no abuse of discretion here. Of particular significance is Edens' failure to account for the fact that Blanco's report was not timely authenticated. In this regard, a timeline of events is relevant. Kennedy noticed Blanco's deposition on July 8, 2003, with the deposition scheduled for July 22. Edens' counsel has indicated that the parties agreed on this date beforehand. *See* Br. of Appellant at 29. The deposition took place on the designated date, and the transcript was completed on August 4. Meanwhile, Edens filed his memorandum opposing summary judgment on July 7 (one day before the Blanco deposition was noticed), and the court issued its order granting summary judgment on August 6 (two days after the transcript was completed).

If Edens knew of the impending deposition when he prepared this response, he could have filed an affidavit stating that he was temporarily unable to "present . . . facts essential to justify [his] opposition," Fed. R. Civ. P. 56(f). He certainly could have presented such an affidavit after Blanco's deposition was noticed, and he may even have been able to present the transcript of Blanco's deposition to the court prior to the entry of summary judgment. Indeed, Edens could have avoided all of this trouble by simply directing Blanco to provide an appropriate affidavit along with his report, or by obtaining such an affidavit later. In light of Edens' failure to perform any of these actions, it was within the discretion of the district court to deny

Edens' Rule 59(e) motion. *See Looper Maint. Serv. Inc. v. City of Indianapolis*, 197 F.3d 908, 915 (7th Cir. 1999) (noting that movant's diligence is relevant factor in ruling on Rule 59(e) motion); *cf. Santiago v. Wood*, 904 F.2d 673, 676 (11th Cir. 1990) (per curiam) (holding that denial of motion to reconsider was abuse of discretion, based in part on movant's evident diligence in filing motion).

### IV.  *Kennedy's Response to the Newspaper Report*

Edens' final claim is that Kennedy violated Edens' First Amendment rights by filing an investigative report in response to a newspaper article describing Kennedy's search of Edens' property. We affirm the entry of summary judgment in Kennedy's favor.

On January 24, 2000, the *Charleston Gazette* published an article describing Edens' conflict with Carney Wright and his complaints against Kennedy. The text suggests that Edens was the prime source for this article, and perhaps the instigator of its publication.

On the day the article was published, Kennedy forwarded to the prosecutor's office a report detailing the investigation he conducted after receiving the anonymous tip. The report described Kennedy's discovery of marijuana plants on Edens' doorstep but added that no evidence of criminal activity was found in Edens' house or its outbuildings. The report also noted that Kennedy chose not to arrest Edens because of his "cooperative attitude, no prior drug history, and his personal request to submit to a polygraph examination compounded with the fact that no evidence was obtained from within the residence that could possibly link the marijuana in the portable container to being grown within the home." J.A. 950a.

Kennedy testified at his deposition that he was required to file an investigative report and send it to the prosecutor notwithstanding his conclusion that no arrest was warranted. He did not file this report promptly because he was "backlogged" with other work and because, in light of his determination not to make an arrest, "[i]t was a closed case to [him]." *Id.* at 409a. Kennedy further testified that he wrote the report in response to a telephone call from a *Gazette* reporter and a subsequent instruction from his supervisor that "you'd better go ahead

and do a report and get it in writing because it sounds like something is going to come of it." *Id.* at 473a (internal quotation marks omitted).

Edens has not been charged with any offense, nor is there any evidence that the grand jury has opened an investigation concerning Edens. Edens testified, however, that the report will "hang[ ] over my head for seven years." *Id.* at 310a. Edens alleges that Kennedy filed this report to help Wright "communicate to Edens that [Wright] had sufficient influence in the law enforcement community that Edens could be subjected to harassing prosecutions while Wright could not be touched." Br. of Appellant at 31.

In order to prove a First Amendment retaliation claim, a § 1983 plaintiff must prove three elements:

> First, the plaintiff must demonstrate that his or her speech was protected. Second, the plaintiff must demonstrate that the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech. Third, the plaintiff must demonstrate that a causal relationship exists between its speech and the defendant's retaliatory action.

*Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000) (citations omitted). Edens' claim fails because there is insufficient evidence in the record to establish the second of these elements. The mere occurrence of retaliatory action is not sufficient to prove this element; instead, the action must have some "adverse impact" on the plaintiff. *Id.* at 685. The only impact demonstrated here is Edens' fear that Kennedy's report might someday result in a prosecution, despite its inclusion of significant exculpatory evidence. Fear of this nature is not sufficient to support a First Amendment retaliation claim. *See Wade v. Goodwin*, 843 F.2d 1150, 1152 (8th Cir. 1988) (rejecting retaliation claim predicated on "speculative apprehensiveness as to future misuse of information"). We therefore affirm the entry of summary judgment on this claim.

## V.  *Conclusion*

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*