**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Antonio OCHOA–ALMANZA,
Defendant-Appellee.**

No. 79–2210.

United States Court of Appeals,
Tenth Circuit.

Argued March 14, 1980.
Decided June 18, 1980.

Christopher M. McMurray, Dept. of Justice, Washington, D. C. (William C. Bryson, Dept. of Justice, Washington, D. C., R. E. Thompson, U. S. Atty., Dist. of N. M., and Thomas S. Udall, Asst. U. S. Atty., Dist. of N. M., Albuquerque, N. M., with him on the brief), for plaintiff-appellant.

Alan F. Zvolanek, Bargas & Zvolanek, Albuquerque, N. M., for defendant-appellee.

Before SETH, Chief Judge, and BARRETT and McKAY, Circuit Judges.

McKAY, Circuit Judge.

This is an appeal from an order of the district court suppressing information obtained by a police officer who made a warrantless entry into a home for the purpose of searching for illegal aliens. The government claims on appeal that the officer had the consent of a six-year-old child to enter the premises. The officer testified that the child was playing in the yard when he approached and that she ran to the house, arriving at the screen door simultaneously with his arrival; that he knocked twice and that she said "come in." The occupants of the house testified that they did not hear anyone knock, that they did not hear the little girl say anything at the door, that the little girl was not around when the officer entered the room and that the officer just "popped right in." Record, vol. 2, at 17. The occupants also testified that the screen door could not be seen from where they were located in a nearby room. The officer admitted that he proceeded some distance from the door after entering the house before he discovered the information which was suppressed. The government presented no evidence as to the little girl's capacity or scope of authority to waive fundamental Fourth Amendment rights for the occupants of the house.

The trial court in its order emphasized that it was applying the three-part test set out in *United States v. Abbott*, 546 F.2d 883, 885 (10th Cir. 1977), adopting a preponderance of evidence standard as mandated by *United States v. Matlock*, 415 U.S. 164, 177, 177 n. 14, 94 S.Ct. 988, 996, 39 L.Ed.2d 242 (1974). The court expressly noted that it was judging the evidence in light of the "totality of the circumstances" under *Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2058–2059, 36 L.Ed.2d 854 (1973). Applying these standards, without deciding whether the little girl had authority to let the police officer enter the house, the court concluded that under the totality of the circumstances the government failed to prove that she gave consent to search the apartment. The trial court put emphasis on the fact that the officers went to the door with the intent to search. This case is thus unlike *Davis v. United States*, 327 F.2d 301 (9th Cir. 1964), where the court emphasized that the officers did not have any intent to search. The *Davis* court distinguished cases like this one

wherein the intent of the several officers at the time of their entry on to the premises without possessing a legal warrant for search or arrest, was actually either to arrest without warrant or search without warrant.

*Id.* at 304.

The government has the burden of proving that consent for a warrantless entry or search was freely, intelligently and knowingly given by one with the authority

and capacity to give such consent. *See United States v. Matlock*, 415 U.S. at 171, 94 S.Ct. at 993; *Schneckloth v. Bustamonte*, 412 U.S. at 248–49, 93 S.Ct. at 2058–2059; *United States v. Abbott*, 546 F.2d at 885. We believe the record justifies the court's conclusion that the government failed to carry its burden of proving a valid waiver of this defendant's right not to have his premises searched without a warrant.

AFFIRMED.

BARRETT, Circuit Judge, dissenting:

In my view, the majority opinion creates a confusing "no man's land" involving issues of "reasonable" warrantless entries and searches. As a result, law enforcement officials are in large measure left to their own devices. The condemned actions of Captain Gonzales are important to the policeman's every day duty of ferreting out criminal conduct. Police officers are entitled to specific guidance in these important areas.

I conclude that law enforcement officials who conscientiously interpret the majority opinion will likely abdicate and abandon police conduct heretofore commonly pursued and approved in our society as accepted within the ambits of the Fourth Amendment warrantless entry and search. The majority casts serious doubt upon the *lawful entry* by Captain Gonzales into the apartment residence because the ". . . government presented no evidence as to the little girl's capacity or scope of [her] authority to waive fundamental Fourth Amendment rights for the occupants of the house." Such *was not* the basis for either the trial court's suppression order or that of appellee before the trial court or here on appeal! The District Court *expressly* found that the six-year old daughter of Ms. Pando did have the capacity to consent to Captain Gonzales' *entry*. The critical focus of the trial court and the cornerstone of that court's suppression order, as acknowledged by the brief of appellee, was solely this: Did Captain Gonzales conduct a non-consensual warrantless search following his entry into the residence? The trial court observed that the

question posed was whether the six-year old child gave Captain Gonzales lawful consent *to search*.

The trial court applied the three-prong test set forth in *United States v. Abbott*, 546 F.2d 883 (10th Cir. 1977) applicable *only* in relation to whether Captain Gonzales had been granted a valid, lawful consent by the six-year old child to *conduct a warrantless search*. Thus, it was the search and the search alone which was the basis and thrust of the trial court's suppression order.

The record is clear that the so-called "search" was conducted from an area *only* two steps removed from the door and that everything occurred in the same and identical room Captain Gonzales had entered into from the doorway. Under these circumstances, it is unfair to police officers to hold out that the trial court's suppression order turned on any issue involving unlawful *entry*. It simply did not. Assuming, as the trial court found, that Captain Gonzales lawfully *entered* the apartment based on the consent of the six-year old girl, I cannot accept the proposition that Gonzales thereafter conducted a *search*. *Immediately* upon his entry, Captain Gonzales *observed* four men who proved to be illegal aliens seated on a sofa within his "plain view" only two or three feet removed from the doorway entrance. Gonzales identified himself as Deputy Sheriff, and inquired who the persons were and who owned the brown car. Gonzales stated that he had a report of some aliens being "dropped around here". Mr. Antonio Ochoa-Almanza, who rented the apartment, stated that the car was his and he observed that it is not ". . . against the law to have friends eating and visiting in the house." Captain Gonzales then requested Mr. Almanza to step outside so that he could talk to him. Thereafter, further conversations were pursued with a Ms. Pando and the four aliens, after Captain Gonzales requested that Mr. Almanza have them come out. Under these circumstances, it matters not what Captain Gonzales' subjective state of mind was when he entered the apartment. He testified that he was in the neighbor-

hood searching for illegal aliens. He was conducting a proper investigation. Shortly before, he had received a radio report transmitting to his sheriff's vehicle then in the general area of the subject residence that a number of illegal aliens had been dropped off in the neighborhood. He was thereafter informed that they were seen arriving at the Pando apartment in a brown car. Captain Gonzales, based on these and other reports, discovered a "brown car" parked in front of the Pando apartment. Gonzales properly determined to pursue the investigation further.

In my judgment, the steps then undertaken by Captain Gonzales were perfectly proper, legal and in keeping with recognized law enforcement technique. Armed with information which may have constituted probable cause but unquestionably amounted to strong suspicion demanding further investigation, Captain Gonzales knocked on the Pando apartment door. The six-year old daughter of Pando invited him to enter. If the issue in this case *now centers* on the authority of Captain Gonzales to *enter* the apartment based on the consent of the six-year old child, it should be squarely, directly and unequivocally faced and decided. When confronted by the District Court, it was resolved in favor of Captain Gonzales. It has not been properly confronted here. Under the state of this record, the only fair conclusion is that Officer Gonzales lawfully *entered* the residence. This is implicitly recognized in the trial court's order which found that "Mrs. Pando's daughter's consent merely to entry, therefore, did not rise to a consent to search the premises sufficiently to satisfy the requirements of the Fourth Amendment." Thus, in my view, the record before us leaves no room for appellate conjecture on the trial court's finding of Captain Gonzales' right of entry.

I turn now to the trial court's finding that Captain Gonzales conducted an unconsented, warrantless search following his lawful entry. I cannot agree. The majority opinion places emphasis on the proposition that Captain Gonzales went to the door with intent to search. That assumption is unfounded and based on conjecture. He did, to be sure, go to the door armed with strong suspicion that illegal aliens may have entered the Pando apartment. That posture, however, could hardly be more than routine police investigative technique. He was certainly then conducting an investigative probe armed with reasonable suspicion. *See United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) and *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). It matters not what his subjective state of mind was at that time. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

Following his entry, Captain Gonzales took only two steps beyond the doorway. He saw the four persons who turned out to be illegal aliens, however, seated on a sofa in the same room only two or three feet from the doorway he had entered. The "two steps" had nothing whatsoever to do with Captain Gonzales' immediate visual notice of the presence of illegal aliens. It could only be the *two steps,* however, which constituted the rationale for the finding of a "search" on the part of Captain Gonzales. One must ask: Would one step have been permissible? Would it have made a difference if the steps had been made in a different direction from that taken? Would it have made a difference if Captain Gonzales had simply rose to his tip toes? Would a different result have been reached by the majority if no steps had been taken? I think not. In my view, it is clear that Captain Gonzales did not venture significantly beyond the area of his invitation to enter the premises in order to implicate the prohibition of the Fourth Amendment forbidding an unreasonable warrantless search. I view Captain Gonzales' actions as valid police work. Furthermore, I believe that the "plain view" doctrine is fully applicable. It is well established that objects falling in the plain view of a police officer who has the right to be in the position to have that view are not the products of a search, and may be seized and introduced in evidence. *Harris v. United States,* 390 U.S. 234, 88

S.Ct. 992, 19 L.Ed.2d 1067 (1968); *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *United States v. Lee*, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927); *United States v. Troutman*, 458 F.2d 217 (10th Cir. 1972); 68 Am.Jur.2d, Searches and Seizures §§ 23 and 88.

Today's opinion leaves an unwarranted implication that Captain Gonzales' entry into the apartment was constitutionally tainted. If this be the view of the majority, it should be unequivocally so declared. The "no man's land" created by dodging the issue serves only to bolster the proposition that such entry did constitute illegal police conduct subject to the harsh, hammer-hard results of the exclusionary rule. That rule should never be applied unless it is fully justified and clearly articulated. Law enforcement officials are entitled to such guidance.

The primary purpose of the exclusionary rule is deterrence of future illegal conduct by the police. The rule must always be measured by society's interest in the apprehension of criminals, the prevention of crime, and trial of offenders. When the courts fail to clearly articulate the reasons and basis for application of the rule, they effectively alert conscientious law enforcement officers not to assume the risk of action they have believed proper and necessary in the course of their training and "on the beat" experience out of fear of civil rights actions, common law tort suits, and possible disciplinary actions.

I view the circumstances confronting Captain Gonzales as quite comparable to the "fleeing" cases—i. e., cases involving fleeing offenders. It is by reason of hindsight only that we can speculate that Captain Gonzales may have had sufficient time to contact a magistrate in order to obtain a search warrant. A more reasonable view is that a prudent, cautious, well trained officer would have done precisely what Captain Gonzales did in this case. Society's interest in ferreting out criminal activity must not be crushed by court "rules" which are not clearly announced and articulated. The majority opinion states that after Captain

Gonzales entered the residence, he admits that he "proceeded some distance" from the door before he "discovered" the information [sight of the illegal aliens] which was suppressed. The record—verified by appellee's brief—establishes that Captain Gonzales took two steps beyond the doorway and observed the four illegal aliens seated on a couch in the very same room he had entered. If this is not "plain view", the doctrine has no application.

The procedures pursued by Captain Gonzales thereafter were in no manner coercive or illegal. Whether viewed in separate parts or in totality, Gonzales' actions met the measure of prudent, proper law enforcement technique. We have today failed, in my view, to follow our well recognized rule that in determining whether an arrest or search warrant should have been obtained, we must evaluate the circumstances as they would have appeared to a prudent, cautious and trained officer at the time of the arrest or search. *United States v. Erb*, 596 F.2d 412 (10th Cir. 1979), *cert. denied*, 444 U.S. 848, 100 S.Ct. 97, 62 L.Ed.2d 63 (1979); *United States v. Brown*, 540 F.2d 1048 (10th Cir. 1976), *cert. denied*, 429 U.S. 1100, 97 S.Ct. 1122, 51 L.Ed.2d 549 (1977); *Trusty v. State of Oklahoma*, 360 F.2d 173 (10th Cir. 1966).

Whatever the "rule" laid down by the majority may be it is certainly intended to deter unlawful police activity through the nurturing of respect for Fourth Amendment values. It is, in my view, so vague, so ill-defined that I fear it will have the opposite effect—that of creating needless doubt concerning "on the beat" police technique important to the administration of the criminal justice system.

I would reverse the trial court's order granting the motion to suppress.