Michael **MADRUGA**, Christine **Madruga, and Katherine Madruga, by and through her Guardian ad litem Christine Madruga, Plaintiffs,**

v.

**COUNTY OF RIVERSIDE, Riverside County Sheriff's Department, Larry Smith, John F. Clark, and David Elden Smith, Defendants.**

No. SACV 03–445–SGL.

United States District Court,
C.D. California.

Nov. 22, 2005.

Stephen E. Miller, Steven K. Beckett, Brunick McElhaney & Beckett, San Bernardino, CA, for Plaintiffs.

Arthur K. Cunningham, John M. Porter, L. Alexandra Fong, Lewis Brisbois Bisgaard & Smith, Christopher D. Lockwood, Arias Aaen, San Bernardino, CA, for Defendants.

## ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

LARSON, United States Magistrate Judge.

Before the Court are the parties' competing motions for summary judgment regarding the constitutional propriety of Riverside County Sheriff Deputy David Elden Smith's warrantless entry into the front courtyard of the plaintiffs' residence during the early morning hours of August 5, 2000. For the reasons set forth below, defendants' motion for summary judgment is **DENIED**, and plaintiffs' motion for summary judgment is **GRANTED**.

## I. STANDARD FOR EVALUATING MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Whether a fact is material is determined by looking to the governing substantive law; if the fact may affect the outcome, then it is material. *Id.* at 248,

106 S.Ct. 2505. Moreover, in construing all the evidence in the record and the reasonable inferences that can be drawn therefrom, the Court must defer in favor of the non-moving party. *See id.* at 255, 106 S.Ct. 2505; *Brookside Assocs. v. Rifkin*, 49 F.3d 490, 492–93 (9th Cir.1995).

## II. FACTS

Many of the facts in this case have been set forth earlier in this Court's April 20, 2005, Order, and are well-known to the parties. The Court will accordingly confine its discussion to those facts which provide a general overview of what precipitated Deputy Smith's presence at the Madruga residence on the night in question and those particular facts which provide an account of Deputy Smith's entry into the Madrugas' property.

Michael Madruga sideswiped a car driven by Buffy Paveloff as Madruga was driving the wrong way in a parking lot at 10 o'clock at night on August 4, 2000. A heated argument ensued between the two over Paveloff's request for Madruga to provide her with his "information." The dispute ended abruptly after Paveloff accused Madruga of being under the influence of alcohol and sent her husband to call the police. Madruga flung his checkbook at Paveloff and fled away from the scene on foot.

When Riverside County Sheriff's Deputy John F. Clark arrived at the scene of the accident, Paveloff informed him that Madruga refused to provide his "information" to her and that Madruga became argumentative with her after she made the request. Deputy Clark reviewed the information contained in the checkbook Madruga left behind and also determined that the car that was left behind in the parking lot was in fact registered to Madruga. Deputy Clark went to Madruga's house in La Quinta, California, just after midnight

and spoke with Madruga's wife, Catherine. She informed him that her husband was still out. Deputy Clark informed Mrs. Madruga that her husband was involved in a hit-and-run collision, that her husband left the scene, and asked Mrs. Madruga to give him a call when her husband came home, "because I want[ ] to talk to him about the crash."

Shortly after one o'clock in the morning, Deputy Clark was advised that Madruga returned to his home. Deputy Clark asked Deputy Smith, who was on patrol in La Quinta at the time, to proceed to Madruga's residence and to detain Madruga until Deputy Clark was able to get to the scene. Deputy Clark later explained that by "detain" he simply meant he wanted Deputy Smith to "just stand by with him [Madruga], that I just wanted to talk to him," and "the reason for detaining him was to make sure he wasn't at home pounding down beers before I got there."

This purpose for his presence at the residence, however, was not relayed to Deputy Smith. Indeed, while en route to Madruga's residence, Deputy Smith sent a message on the mobile data terminal inside his patrol vehicle, asking Deputy Clark to "confirm detained as in handcuffed or just sit with him," but no reply was ever tendered in response. Deputy Smith later gave the following account during the criminal prosecution of Madruga of what he believed his purpose was when he arrived at the Madruga residence that night:

Q. When you got to that address and got out of your patrol car, what was your purpose for being there?

A. To contact and detain a subject reference [in] an earlier traffic collision that he left the scene of.

Q. And by "contact and detain," could you please tell the jury exactly what you mean by "contact and detain"?

A. My—my goal was to go contact the subject that was described to me as Michael Madruga, who lived at that address. The deputy asked that I detain him for further questioning and possibly—I believe he wanted to take photographs and fingerprints of him at the Palm Desert [sheriff's] station. So therefore I would go and detain him and hold him for the other officer so he would not flee the scene again.

. . . . .

Q. And by detaining him, you meant physically restrain him, is that right?

A. I could detain him by talking to him, placing him in the back of my unit. I could detain him by placing handcuffs on him. Whatever at the scene seemed necessary.

Deputy Smith further explained that it was his understanding that he was told to detain Madruga because Madruga committed a crime: "I was—I was told that the crime had been committed, and under good faith I went to detain him," and "I was requested by Deputy Clark . . . to contact the suspect of a 2002 V.C. [Vehicle Code] . . . and detain him." [1]

When Deputy Smith arrived in front of the Madruga residence it was just a little bit past one in the morning. There were no street lights illuminating the area. Deputy Smith parked his patrol car across the street from the Madruga residence, stepped out of his cruiser, and retrieved a flashlight.

The entire residence—a single story, 1397 square-foot home—is enclosed by a five-foot, four-inches tall solid wall com-

1. The code section referenced by Deputy Smith requires a driver involved in an accident to provide, "upon request," a copy of "his driver's license and vehicle registration" before leaving the scene of the accident. CAL. VEH. CODE § 20002(a)(1).

posed of cinder block and plastered with stucco, with intermittent stretches made of large wooden planks with narrow slats between the planks. The wall increases in height at the point where it runs parallel to the side yard to the home. Moreover, when it reaches the side-yard, the wall lies but a few feet away from the house proper. The part of the wall enclosing the front of the house had two, solid, wooden gates (also five-foot, four-inches tall), one for foot traffic and the other fronting the entire driveway. Upon the upper right corner of the wooden gate blocking access to the driveway was a large yellow sign with the word "WARNING" written in large letters against a red background, and beneath that word a picture of a Doberman pincher and a German shepherd with the words "Guard Dogs." The wooden gate fronting the driveway was only a few feet from the wooden gate foot traffic used. Moreover, the "WARNING Guard Dogs" sign was affixed on the portion of the driveway gate that was closest to the foot-traffic gate.

With respect to the front of the house, the block wall runs parallel with the house and is built seventeen feet in front of the house proper. "There are no sidewalks running along the exterior of the solid wall," save in front of the wooden gates; instead a planter bed with low-growing vegetation bordered the wall. Between the wall and the front of the house proper is a courtyard that is used for events such as family barbeques, gatherings, or to simply sit outside and read a book or newspaper. The nature of the wall, both in terms of its dimensions and the materials of which it is composed, is such as to completely shield from public view any activities taking place in the interior courtyard. (*See* Addendum to Opinion containing Pl's Exhibits 16 & 68 representing photographs of the front of the residence).

The gas and electric meters for the home are located in the courtyard. Utility servicemen stand on the outside of the block wall and extend a long pole over the top of the wall and read the meter with a mirror; they do not enter into the courtyard itself or climb the wall and peer over. The mailbox for the home is located across the street from the house near where Deputy Smith parked his patrol car that night.

"Both gates are always kept closed unless they have to be opened to walk or drive through," and were so closed on the night in question. The wooden gate for foot traffic had a door knob and a deadbolt, either of which could be locked independently of the other, but both of which were left unlocked on the night in question. Immediately next to the front wooden gate for foot traffic, the Madrugas normally kept a handbell either on top of the block wall or attached to the front doorhandle itself to allow visitors and others a means of announcing their presence and seeking permission to enter into the courtyard. On the door knob on the inside of the gate door the Madrugas kept a jingle bell which would sound as a person passed through the gate into the courtyard. On the night in question, however, the Madrugas are unsure whether the handbell was in its designated location or whether it fell into the planter bed beside the gate. They are, however, sure, and there is no contrary evidence, that the jingle bell was affixed to the interior door knob that evening.

When he arrived at Madruga's residence, Deputy Smith, who did not have a warrant, opened the unlocked wooden foot traffic gate, entered the courtyard, proceeded to the home's front door, opened the front exterior metal screen door, and knocked on the front interior wooden door with his flashlight. Deputy Smith asserts that he did not see the guard dog sign or hear or see a bell—be it a handbell or a jingle bell—when entering through the

front gate into the courtyard. He did notice, however, that a porch light next to the front door to the home was illuminated.

Madruga came to the door and Deputy Smith asked him if he would come outside to talk with him. Madruga refused. Deputy Smith again asked if Madruga would come outside to talk. Madruga crossed his arms and in a loud voice refused Deputy Smith's request. At that point Deputy Smith later stated, "You could tell [Madruga] . . . didn't really want to talk." Notwithstanding his clear understanding that Madruga did not want to speak with him, Deputy Smith asked a third time whether Madruga would talk to him. When pressed why he continued to seek a tete-a-tete with Madruga even after his earlier refusals made clear his wish not to talk, Deputy Smith admitted it simply was a means on his part "to keep an eye on [Madruga] at all times." Madruga refused Deputy Smith's third request to talk, locked the front screen door, and walked away from the door and toward the kitchen area.

Mrs. Madruga was standing nearby. Deputy Smith asked her if he could come inside and she agreed, unlocking the screen door and opening it for him. The time from when he first knocked on the door until Mrs. Madruga admitted him inside the home was about a minute and a half. Not long after entering the home, Deputy Smith walked up to Madruga and grabbed his right hand. A melee quickly ensued, leading to Deputy Smith spraying Madruga (and perhaps, accidentally, Mrs. Madruga) with pepper spray and striking Madruga with his baton, and ending with Madruga in handcuffs and under arrest.

A few days later some sheriff's deputies paid a visit to the Madruga residence. Those deputies announced their arrival by calling out to those inside the home from the other side of the block wall, seeking their attention. Before receiving admittance they did not fling open the wooden gate, walk through the courtyard, or knock on the home's front door.

## III. ANALYSIS

The only Fourth Amendment challenge at issue in the instant competing motions is Deputy Smith's entry into and continued presence in the front courtyard before being admitted inside the Madrugas' home. The Madrugas asserts that Deputy Smith's warrantless entry into the front courtyard through the front wooden gate on the perimeter of their home violated the Fourth Amendment, as the block wall/wooden gates demarked the boundaries of the curtilage to their home and, therefore, the area just inside the same—the courtyard—was cloaked in the same protections against unreasonable searches and seizures as are afforded to their home itself.

The Fourth Amendment protects the rights of "people to be secure in their persons, houses, papers, and effects" from unreasonable searches and seizures. U.S. CONST. amend. IV. "[T]he protective force of the fourth amendment [is no] more powerful than it is when the sanctity of the home is involved." *Los Angeles Police Protective League v. Gates,* 907 F.2d 879, 884 (9th Cir.1990). That a person's home is the one place most resolutely protected under the Fourth Amendment arises from a view, as old as the common law, that "[t]he house of every one is to him as his castle and fortress, as well for his defence against injury and violence, as for his repose." *Wilson v. Layne,* 526 U.S. 603, 609–10, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)(quoting Semayne's Case, (1604) 77 Eng. Rep. 194, 195 (K.B.)); *see also* 4 WILLIAM BLACKSTONE, COMMENTARIES * 223 ("the law of England has so particular and tender a regard to the immunity of a man's house, that it stiles it his castle, and will

never suffer it to be violated with impunity"). A home stands as the one place, and perhaps the final place, to where a person can retreat and seclude themself from the rest of the world free from intrusion, interference or surveillance, by the government or by others. *See Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886)(speaking of "the sanctity of a man's home and the privacies of life"); *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)("At the very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion"); *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)("a man's home is, for most purposes, a place where he expects privacy")(Harlan, J., concurring); *Gates,* 907 F.2d at 884 ("The sanctity of a person's home, perhaps our last real retreat in this technological age, lies at the very core of the rights which animate the amendment"); *United States v. On Lee,* 193 F.2d 306, 315–16 (2nd Cir.1951)(Frank, J., dissenting)("A man can still control a small part of his environment, his house; he can retreat thence from outsiders, secure in the knowledge that they cannot get at him without disobeying the Constitution .... [s]ociety must provide some such oasis, some shelter from public scrutiny ... some inviolate place—which is a man's castle").

■ The protections the Fourth Amendment affords to a person's home do not stop at the home's walls, doors, and windows, but extend to the curtilage of the house as well. *See Oliver v. United States,* 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). The curtilage was a concept devised under the common law to distinguish between petty and menacing trespass to a person's property. "In the common law of England the curtilage was the part of a person's property that a criminal had to break into in order to be guilty of burglary. Since burglary was a capital offense, there was a felt need to confine it to the most alarming forms of breaking and entering." *United States v. Redmon,* 138 F.3d 1109, 1130 (7th Cir.1998)(Posner, C.J., dissenting).

The curtilage, as distinguished from "open fields," thus understood has since been invoked to describe the "area intimately linked to the home, both physically and psychologically," *California v. Ciraolo,* 476 U.S. 207, 212–13, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), and against which intrusion from governmental agents, much like the burglars of old, is sought to curb.

Aside from these abstractions concerning the evil against which the curtilage sought to protect against under the common law, the term was also given a more concrete definition. "The word curtilage is derived from the Latin cohors (a place enclosed around a yard) and the old French cortilliage or courtillage which today has been corrupted into courtyard. Originally it referred to the land and outbuildings immediately adjacent to a castle that were in turn surrounded by a high stone wall. Today its meaning has been expanded to include any land or building immediately adjacent to a dwelling. Usually it is enclosed some way by fence or shrubs." *United States v. Romano,* 388 F.Supp. 101, 105 n. 4 (E.D.Pa.1975). One noted jurist explained the meaning of a home's curtilage as follows:

[T]he constitutional boundaries of the home are somewhat larger than the walls of the house; they include the curtilage, that area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life. The concept arises out of the common law, which viewed a man's home as his castle of defence. The curtilage included not only the castle walls, but also those turrets, moats and baileys

that adjoined the residence and whose breach the owner would regard as a violation of the security of the home. At the same time, no distant barn, warehouse, or the like, are under the same privileges. When we consider modern homes, we might include within the curtilage an adjoining garage, the yard within the white picket fence, or the gazebo where the kids keep their pool toys. The real question is whether the home owner might reasonably regard those structures as part and parcel of the home itself.

*United States v. Johnson,* 256 F.3d 895, 911 (9th Cir.2001)(en banc)(Kozinski, J., concurring).

The initial question thus becomes whether the courtyard to the Madrugas' home was part of the home's curtilage. If not, then Deputy Smith's entry upon it does not run afoul of the Fourth Amendment. *See Oliver,* 466 U.S. at 180, 104 S.Ct. 1735 ("only the curtilage, not the neighboring open fields, warrants the Fourth Amendment protections that attach to the home").

■ The Supreme Court in *United States v. Dunn,* 480 U.S. 294, 301, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), identified four factors for courts to consult in determining whether the homeowner may reasonably regard the area in question as "part and parcel of the home itself": (1) The proximity of the area to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by people passing by. These four considerations, however, are just that: Simple guideposts. They are not to be "mechanically applied," nor do they yield a definite answer, but are merely meant as "useful analytical tools" to consult in deciding "whether the area is so intimately connected to the home that it

should fall under the umbrella of the Fourth Amendment's protections." *Johnson,* 256 F.3d at 901, 911.

■ Consulting these four factors, the Court finds that it cannot be seriously questioned that the front courtyard to the Madrugas' home fell within the home's curtilage. The courtyard was immediately adjacent to the home, it was completely surrounded by a five-foot, four-inches tall solid wall that shielded the courtyard from public view, there was a "WARNING guard dog" sign posted a few feet from the wooden foot traffic gate, the two solid wooden gates (themselves over five-feet tall) that provided access to the courtyard and driveway had two separate locks and were in fact closed (if not locked) at the time of the entry in question, and the courtyard itself was used for activities intimately associated with those that take place inside the house itself such as barbeques, parties, or as an area of quiet contemplation.

That the courtyard is part of the curtilage to the Madrugas' home and, hence, deserving of Fourth Amendment protection does not mean that limits on access to the home and the courtyard are coextensive. Access to one's home is strictly forbidden absent a warrant or exigent circumstances. *See Payton v. New York,* 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Encroachment upon the curtilage, however, is viewed more pragmatically than categorically. Much of this stems from the varying uses to which a home's curtilage can be put, as well as to the fact that, more often then not, such areas are located outdoors leaving the possibility that others can see what is going on and are regularly trodden upon by individuals other than the homeowner. These considerations tend to diminish the expectation of privacy and, accordingly, provide less of

a Fourth Amendment impediment to entry than is true for one's home.

█ It is precisely this malleability that Deputy Smith seeks to exploit in this case, arguing that his crossing through the courtyard falls within the implied invitation exception to intrusions upon a home's curtilage as he was simply seeking to talk with Madruga. The exception he invokes basically seeks to exclude from Fourth Amendment protection those causeways, sidewalks, and other access routes postmen, visitors, and salespersons take to and from the home's entrances to speak to the home's occupants. If a homeowner allows visitors and other third parties to use those routes to speak to them, then there is no constitutional basis to place law enforcement officers who seek to use those same means of egress and ingress over the curtilage to speak to the home's occupants in a different position. *See Redmon,* 138 F.3d at 1130 (Posner, C.J., dissenting) ("Most homeowners extend an implicit invitation to social and business invitees to walk up to the front door"). It is not the identity of the visitor that is determinative, but the homeowner's expectation of privacy. The likelihood of such entry over the curtilage negates any expectation of privacy the homeowner may have regardless of the identity of the person making the entry. With this understanding, law enforcement has developed an investigative technique known as the "knock and talk" to use when officers do not have a warrant on hand to enter a home. As one court explained the technique:

> [T]he police approach a house or apartment in which they suspect [criminal activity] is occurring. They listen outside the door for a brief period of time, and then they knock on the door and attempt to persuade whoever answers to give them permission to enter. If consent is forthcoming, they enter and interview the occupants of the place; if it

is not, they try to see from their vantage point at the door whether [any indicia of criminal activity] is in plain view. If it is, then they make a warrantless entry. As this description makes plain, the 'knock and talk' procedure typically does not involve the prior issuance of a warrant.

*United States v. Johnson,* 170 F.3d 708, 711 (7th Cir.1999).

Simply stating *post facto* that an officer's entry was part of a "knock and talk" is insufficient to justify the intrusion. The knock and talk rule has limits. *See id.* at 720 ("the police themselves must recognize the inherent limits in this more informal way of proceeding"). Key to the legitimate invocation of the knock and talk technique are two factors that reasonable police officers are expected to recognize: The *purpose* for which the officers undertake such an intrusion into the curtilage; and whether the homeowner took any actions to express a higher expectation of privacy over the means of egress and ingress to his home than is ordinarily the case. Is the officer there to ask questions of or otherwise talk to the occupants as any ordinary citizen would, or does the officer's purpose for being there have a much more narrow law enforcement objective—to search the curtilage or otherwise intrude upon it in order to arrest the occupant? If the latter, then the knock and talk exception does not apply. As the Ninth Circuit noted long ago:

> *Absent express orders from the person in possession against any possible trespass,* there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's 'castle' with the *honest intent of asking questions of the occupant* there-

of—whether the questioner be a pollster, a salesman, or an officer of the law. *Davis v. United States,* 327 F.2d 301, 303 (9th Cir.1964) (emphasis added); *see also Redmon,* 138 F.3d at 1130 (Posner, C.J., dissenting)("in doing so the homeowner does not, as it were, 'waive curtilage.' The social and business invitee, including a police officer whether invited or uninvited, must confine himself to the prescribed route, rather than treating the invitation as one to roam the property at will, peering into the windows of the home").

Neither consideration supports Deputy Smith's reliance on the knock and talk technique in this case. First, unlike a salesperson or pollster, he did not enter the curtilage to the Madrugas' home with "the honest intent of asking questions," but rather to "detain" Madruga. Second, it is clear that the Madrugas did in fact take measures to keep sales representatives and other such social and business invitees from being able to walk up to their front door, knock, and attempt to talk to them unannounced. Given the measures the Madrugas took to ward off entry by such uninvited third parties, it should have similarly been clear to Deputy Smith that the generally understood implied invitation to walk up to the front of the home and talk to the home's occupants was revoked.

### 1. *Intent*

Here it is undisputed that, when Deputy Smith walked through the curtilage to the Madrugas' residence, he did so with the intent to detain Madruga, not for the purpose of conversing. Deputy Smith candidly admitted that his efforts to engage Madruga in conversation through the front screen door were nothing but a ruse on his part to keep Madruga pinned inside the home and unable "to flee" until Deputy Clark arrived. If his efforts at talking to Madruga did not avert Madruga from attempting to leave his home, Deputy Smith made it clear that he would have placed Madruga in handcuffs and/or put him in the back of his patrol car until Deputy Clark arrived. Such an intent to detain is altogether at odds with the rationale for the knock and talk exception—allowing law enforcement the same visitation privileges homeowners extend to third parties who wish to engage in a *bona fide* conversation with them. Deputy Smith did not want to talk, he wanted to detain. The same cannot be said of other persons who use the same causeways to and from the home's front door, be they salespersons, trick-or-treaters, or deliverymen. In each instance, the intent of the third party is to briefly speak with the occupant in the hopes of making a sale, receiving candy, or handing over a package; it is not to keep the occupant from being able to leave his or her home.

Deputy Smith claims that the law is unsettled as to whether the knock and talk exception is inapplicable to situations where police officers use a home's ordinary causeways when they have no intent to talk but only an intent to detain or arrest a home's occupants. Not so. To begin, the court's announcement of the knock and talk exception in *Davis*—over 40 years ago—made clear that it applied only when the officer had "the honest intent of asking questions." 327 F.2d at 303. The message from the court's reference to "honest intent" is clear and unambiguous: The exception is limited to only those situations where a law enforcement official was genuinely seeking to do something that the homeowners allowed other third parties to do—approach the home to talk to the occupants. Here, Deputy Smith had no such honest intent on his part. Rather, his expressions of seeking to talk to the Madrugas was a ruse designed to detain Mr. Madruga for however long it was necessary. This intent is borne out by Deputy Smith continuing to speak to Madruga even after it became apparent that Madru-

ga did not wish to speak to him. Even the most persistent salesperson would not continue to make a sales pitch after a homeowner rebuked him three times, locked the door, and walked away from him.

Putting to rest any ambiguity on this point, two paragraphs after the sentence announcing the court's holding in *Davis*, the Ninth Circuit distinguished the circumstances giving rise to the knock and talk exception from those "wherein the intent of the several officers at the time of their entry on the premises without possessing a legal warrant for search or arrest, was *actually* either to arrest without warrant or search without warrant." *Id.* at 304 (emphasis added); *see also United States v. Ochoa–Almanza*, 623 F.2d 676, 677 (10th Cir.1980)(making the same distinction that the implied invitation exception is inapplicable to situations where the officers possessed an intent to search or arrest the home occupants). Deputy Smith's actual intent in this case was plain and unambiguous—to "hold" Madruga by whatever means necessary, be it by a feigned conversation, handcuffs, or placement in the back of the patrol car, "so he would not flee the scene again" until "the other officer" arrived. Deputy Smith's candor as to his actual purpose lays bare any assertion on his part that he believed the knock and talk exception somehow sanctioned his intrusion into the courtyard.

That Deputy Smith did not seek to *arrest* Madruga but rather sought to *detain* him is irrelevant, as in either instance the officer's entry upon the curtilage had a purpose that would normally require some showing—be it probable cause for an arrest or reasonable suspicion for a detention—to justify the officer's encroachment upon the curtilage, *see United States v. Charley*, 396 F.3d 1074, 1079 (9th Cir.2005) ("not every detention by law enforcement officials amounts to arrest or custody under the Fourth Amendment. Arrests and

detentions are both 'seizures' under the Fourth Amendment, ... the former requires a showing of probable cause, while the latter can be justified by reasonable suspicion of criminal activity"), something which is not needed if the officer is simply there to knock and talk. *See United States v. Cormier*, 220 F.3d 1103, 1109 (9th Cir.2000) ("no suspicion needed to be shown in order to justify the 'knock and talk' "). Moreover, it seems apparent to this Court that Deputy Smith's "detention" of Madruga was but a prelude to the arrival of Deputy Clark, who would formally arrest Madruga. Deputy Smith himself admitted that Deputy Clark wished to have Madruga "detained" so Deputy Clark could "fingerprint" him and "take him down to the police station." Fingerprinting and taking a suspect down to the stationhouse are reserved for instances when someone is under arrest, not simply stopped or detained. In any event, Deputy Smith's intent when he approached the Madrugas' home on the night in question ran far afield from that *Davis* contemplated in announcing the knock and talk rule.

Given that Deputy Smith did not have "an honest intent of asking questions," but instead the intent to detain Madruga by restraining his freedom of movement, the implied invitation exception does not apply in this case.

### 2. *Enhanced Curtilage*

The knock and talk rule is grounded on the understanding that the curtilage over which an officer is intruding to gain access to the home's front door is open to the public to use. *See Redmon*, 138 F.3d at 1130 (Posner, C.J., dissenting)("Most homeowners extend an implicit invitation to social and business invitees to walk up to the front door"). *Davis*, however, recognized that in some instances this assumption may prove untrue, specifically

when a homeowner has taken additional measures to impede or otherwise block access to the front door by the viewing public. 327 F.2d at 303 (noting that knock and talk inappropriate when there exists "express orders from the person in possession against any possible trespass"). In those instances, *Davis* recognized that the privacy enhancement made to the curtilage by the homeowner would serve to apprise the officer, as it would any would-be salesperson, that access to the home's front door would require the homeowner's pre-approval. *Id.*

The measures taken by the Madrugas in enclosing and secreting from view the courtyard to their home were such as to express a clear intent to exclude uninvited visitors to keep away. The imposing edifice of the five-foot, four-inch high block wall, the corresponding closed and high solid wooden gates in front of the driveway and the courtyard proper, and the "WARNING Guard Dogs" sign all communicated quite explicitly to any would-be salesperson that it was not business as usual in attempting to approach the home's front door. By taking these measures the Madrugas could reasonably expect all such visits to cease when they have expressed their intent to exclude strangers by sealing the property around their home and posting a "WARNING Guard Dogs" sign. Indeed this clear sentiment was observed and readily understood by utility workers who did not enter into the couple's courtyard, but instead used a long pole with a mirror to read the utility meters located in the courtyard.

The block wall in this case is a far cry from the stereotypical white picket fence Hollywood movie studios have portrayed to the viewing public as surrounding the typical American suburban home. Here it stands nearly six-feet tall, necessitating individuals to climb up on or otherwise find some means to look into the courtyard as it is effectively shielded from human eyes. Such blockage of sight from a person walking along the street extends even to the home's driveway. The two gates similarly operate to obfuscate the courtyard from view. They are made out of solid wood with thin slats that are as tall as the block wall itself. Simply put, the curtilage to the Madrugas' home is more on a par with the moat and castle walls of old than the white picket fences of modern times. *Compare with United States v. Baldwin,* 691 F.2d 718, 722 (5th Cir.1982)(terming "the dilapidated fence [the officers] had traversed was regarded as no more than a barrier designed to 'keep the hogs in, not to keep anyone out,' and hence could not be characterized as a privacy or exclusionary fence"). Such extensive measures to shield the area from view are not merely an attempt at landscape design or aesthetics, but clearly serve the practical purpose of conveying an obvious message to any who happen upon it: Keep away, this area is private, and it is not for you to look at, pry into, or, much less, walk through unannounced and uninvited.

If the size and scope of the wall surrounding the courtyard did not impress this message upon the viewer, the posting of the "WARNING guard dog" sign on the wooden driveway gate just a few feet away from the wooden foot traffic gate—and within view of any reasonable person walking through the wooden foot traffic gate even at night (see Addendum Pl's Exhibit 68)—would reasonably dispel any doubt. Other courts have found that the use of similar signs convey this message. *See, e.g., People v. Mendoza,* 176 Cal.Rptr. 293, 122 Cal.App.3d Supp. 12, 14 (1981)(noting that where there is "a locked gate, a high solid fence blocking the front yard from view, a written notice to keep out or beware of dog, *or* perhaps a doorbell at the front gate," it would be understood by "anyone having reason to talk to the resi-

dents" that they could not simply "open the front gate" and proceed to the front door (emphasis added)); *State v. Poulos*, 149 Or.App. 351, 356–57, 942 P.2d 901 (1997)(placement of no trespassing sign and beware dog sign, even in the absence of a gate, fence or barrier, was enough to apprise "even the customary casual visitor [they] would [not] be welcome on defendant's property"). Defendants' attempt to cast doubt on the significance of this sign because it did not contain the words "No Trespassing" or "Keep Away" is divorced from reality and elevates form over substance: Common sense and common experiences teaches us that such "WARNING Guard Dog" signs are placed to dissuade people, be they intruders, sales representatives, delivery agents, or even police officers, from approaching the home. Such signs are meant as a warning to potential visitors that entry is dangerous, as they may be mauled by a dog if they approach unannounced.[2] Making threats to one's life and limb clearly illustrates a homeowner's effort to communicate to uninvited guests to stay away. Simply put, anyone seeing such a sign would understand that the homeowner seeks to exclude them from entering the area beyond the sign.[3]

In effect, the various measures taken by the Madrugas to seclude the courtyard from public attention effectively transformed the courtyard into the home's foyer or antechamber. That this message of exclusion and expression against entry into the courtyard was obvious to those who saw it, one need look no further than the actions of the sheriff deputies who arrived at the Madruga residence a few days after the incident in question. Those deputies did not contact the Madrugas by opening the wooden gate, walking through the courtyard, and knocking on the front door as Deputy Smith had done. Instead, those deputies called out to the Madrugas from the other side of the block wall, seeking their attention.

The Court finds that these circumstances are such an instance of an express command against unannounced entry into the home's curtilage to approach the front door for purposes of asking questions or making sales pitches. None of the cases cited by defendants alter the Court's conclusion.

The case of *United States v. Hammett*, 236 F.3d 1054 (9th Cir.2001), pressed by defense counsel at the hearing herein, is readily distinguishable. There agents were surveilling the Hawaiian countryside by helicopter for marijuana plants growing amongst the lush flora and fauna when they spotted a home that had "a distinct green color beneath the translucent roof" of the home. Such markers raised suspicions of whether or not drug activity was afoot at the home. An unimproved dirt road leading to the front of the house, provided access to the only door to the home. At the entrance to the dirt road was a sign prohibiting trespassing, and two steel poles connected by a chain. Moreover, the property boundaries to the home were not marked or enclosed with a

---

**2.** Defendants make much of the fact that the Madrugas did not, at the time, own any guard dogs in the true sense of the word, but instead only had a three-legged chihuahua and a cocker spaniel/poodle mix. Aside from the danger of underestimating any cocker spaniel, the breed of the dogs owned by the Madrugas is irrelevant to the issue in this case. What is relevant is that the Madrugas took steps to communicate to the public that they could not simply walk up to their front door unannounced, not whether they would have been able to carry through with the threat such a sign conveys to the viewer.

**3.** To make sure that Spanish-only speaking visitors would also understand this message, the Madrugas posted a Guard Dog sign in Spanish on an interior fence located at the back of the driveway.

fence. The agents landed the helicopter in an open field approximately 150 yards from the side of the home, marched through the open field to the front of the home, and knocked on the door seeking to talk to the home's occupants. By taking this path the officers never crossed the dirt road, nor saw the no trespassing sign or the chained posts barring entry onto the dirt road leading to the home. When no one responded, the agents proceeded to circle to the rear of the house, knocking on the walls to the home as they did so in an effort to rouse anyone who may be inside. As they did so, one of the officers noticed a small crack in the side of the house and, from that vantage point, observed three marijuana plants growing inside the home. The homeowner later complained that the officers' approach to the home's front door was an unlawful encroachment upon the home's curtilage. 236 F.3d at 1056–57.

The Ninth Circuit disagreed, noting that officers may approach a home through its curtilage when it is done "for the purpose of asking questions of the occupants." *Id.* at 1059. As for the officers circling to the rear of the home, the court observed that "there is nothing unlawful or unreasonable about going to the back of the house to look for another door, all as part of a legitimate attempt to interview a person." *Id.* at 1060. With respect to the no trespassing sign, the court dismissed the significance of such signage by noting that the photographic evidence submitted clearly indicated that the officers would not have seen the sign from where they entered the property. *Id.* The court also dismissed the suggestion that the officers deliberately took a path in order to avoid seeing the sign as being similarly dispelled by the photographic evidence, which "clearly illustrate that the area where the officers set the helicopter down was the closest open area to [the] home and, as such, offered a logical landing site." *Id.*

Here, however, Deputy Smith did not enter into the home's curtilage for the purpose of asking questions, but to detain Mr. Madruga. Moreover, the efforts at excluding entry into the courtyard—a large, solid block wall and accompanying large-sized solid wood gates—were far removed—even to the casual observer—from the open fields surrounding the home in *Hammett.* Moreover, the photographic evidence submitted to the Court in this case, unlike in *Hammett,* also clearly depicts the "WARNING Guard Dog" sign as being prominently posted within a few feet of the wooden foot traffic door that Deputy Smith used to gain entry into the courtyard. His path, unlike the officers in *Hammett,* took him within viewing distance from the sign.

The other cases to which defendants cite are similarly distinguishable. They either did not involve a fence, be it solid or otherwise, obscuring from view the access route in question and/or did not have signs prominently displayed on the property evincing the homeowner's intent for others to keep away. *See, e.g., United States v. Roberts,* 747 F.2d 537, 540–42 (9th Cir.1984)(upheld police entry upon road that had signs marked "Private Road Keep Out," "No Hunting," "No Trespassing" alongside the road; court noted that road in question was shared "with residents of five other houses" something which "is incongruent with the common law concept of curtilage," that "[t]he private road does not provide the setting for intimate activities of home life," and that "the road is easily accessible to utility companies," thereby negating any inference conveyed by the signs that the "private road [was] an area for protected intimate activities"); *Palmieri v. Lynch,* 392 F.3d 73, 75–76, 82 (2nd Cir.2004)(entry into backyard of home was upheld even though there was "stockade fencing" that "completely encloses the side and rear [side] area of the property

physically" and the gate allowing entry to the rear through the side yard had affixed to it a sign with the words "PRIVATE PROPERTY—NO TRESPASSING" and another sign with the words "Beware of Dog"; court noted that, despite stockade fencing of the side to the property, the back of the property did not have similar fencing and was completely exposed to public view as it abutted a harbor where boatgoers could see unhindered what was going on in the backyard, and the fence itself was not high enough to block views of the backyard from neighbors' property, hence homeowner's privacy interest in backyard was "severely diminished"); *United States v. Hatfield*, 333 F.3d 1189, 1194 (10th Cir.2003)(finding that officers parking their patrol car upon driveway and walking about on concrete parking pad was not violative of home's curtilage as "driveway was open to the public," a point which court termed "an important factor"; no indication of any signs posted in front of the driveway or that the driveway was enclosed or otherwise access to the same was blocked from the public); *United States v. Bradshaw*, 490 F.2d 1097 (4th Cir.1974)(no mention of any enclosures or signs); *United States v. Titemore*, 335 F.Supp.2d 502, 504–06 (D.Vt.2004)(curtilage enclosed by a "rail fence along . . . [r]oad that partially restricts access to [home's] porch," but is "essentially decorative"; porch "area was not enclosed or blocked from public view" despite fence and "[t]here were no signs restricting access to the porch in any way"); *United States v. Gonzales–Barrera*, 288 F.Supp.2d 1041 (D.Ariz.2003)(no discussion of any signs excluding entrance or barriers (be it fences, gate, etc.,) to entry upon the causeways to the home's front door); *United States v. Barrera–Martinez*, 274 F.Supp.2d 950, 958–59 (N.D.Ill.2003)(entry onto cement apron in front of an apartment's garage was upheld as "the apron

. . . could easily be observed from the alley"; again no mention of signs or fences).

Indeed, in some of the cases cited by defendants the court made no mention of the knock and talk rule at all, but instead held the area intruded upon by the officers was part of the open fields surrounding the home—an area not even protected by the Fourth Amendment—and not part of the home's curtilage. *See United States v. Baldwin*, 691 F.2d 718, 720 (5th Cir.1982)(upholding officer's viewing of a metal shed behind a house in the country as being part of the open fields to the home, not home's curtilage; the shed was surrounded by a "three feet high [fence] that was constructed of chicken wire and slatboard" and officer went to the edge of the fence and peered from that vantage point the activities inside the shed); *United States v. Pace*, 955 F.2d 270, 272–73 (5th Cir.1992)(viewing the inside of a barn through a hole in the wall was upheld as barn was part of the 3 to 4 acres of open fields surrounding home, and not home's curtilage, even if the entire property was "surrounded by a fence . . . constructed of 'hog wire' topped with several strands of barbed wire . . . [and] approximately four feet high" and with a closed gate with a lock and chain and a "Beware of Dog" sign).

Finally, one of the cases cited by defendants actually buttresses the Court's conclusion that the measures taken by the Madrugas apprised the public of their desire to keep uninvited guests who wished to speak to them out of their courtyard. In *Edens v. Kennedy*, 112 Fed.Appx. 870 (4th Cir.2004), an unpublished opinion by the Fourth Circuit, the home was surrounded on three sides by a fence and on the fourth side by dense vegetation. The gate to the fence was "kept locked, and the fencepost next to the gate [wa]s marked with a . . . 'No Trespassing' sign." *Id.* at

872. The fence, however, did not "obscure the view of the home from the road ... because its rails are separated by wide gaps." *Id.* Moreover, there was "a gap approximately four feet wide between the fence and woods; this gap is near the road that runs in front of ... home." *Id.* at 873. The officers walked through this gap unannounced in an effort to talk to the home's occupants. The Fourth Circuit held that, despite this gap in the enclosure, the officer's entry violated the Fourth Amendment as the homeowner's enclosing the curtilage with a fence, locking the gate to the fence, and posting of a No Trespassing sign communicated an intent to exclude uninvited strangers from approaching their front door. *Id.* at 875. "The effect for Fourth Amendment purposes [was] to extend the walls of the home to the edge of the curtilage. This is because the act of sealing the property creates an elevated expectation of privacy" on the par with being inside the home itself. *Id.* The same is true here.

### 3. Qualified Immunity

■ Deputy Smith finally seeks immunity from suit by arguing that the uncertainty in the law at the time he entered into the courtyard was such that a reasonable officer would not have known that his act violated the Fourth Amendment.

"[G]overnment officials ... generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Such "immunity from suit" flows from the acknowledgment "that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 2158, 150 L.Ed.2d 272 (2001). To decide whether a police officer is entitled to qualified immu-

nity, a court must first determine whether the facts "[t]aken in the light most favorable to the party asserting the injury[, *i.e.,* the plaintiff,] ... show [that] the officer's conduct violated a constitutional right ...." *Id.* at 2156. If so, the next step is to ask whether "the right [that was violated] was clearly established ... in light of the specific context of the case." *Id.* In other words, "would [it] be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*

For the reasons stated above, Deputy Smith's encroachment on the curtilage to the Madrugas' residence violated a constitutional right. This leaves the question of whether violation of that right was clearly established at the time Deputy Smith made his entry into the courtyard. *Saucier* provides that "[f]or a right to be clearly established, it must be defined with sufficient specificity that a reasonable officers would have known he was violating it." *Haugen v. Brosseau,* 339 F.3d 857, 873 (9th Cir.2003), *overruled on other grounds,* 543 U.S. 194, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004). If Deputy Smith made a reasonable mistake about what the law requires, he is immune from suit. This question is typically answered by consulting cases in existence at the time of the incident that have materially similar factual scenarios. *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151 (noting qualified immunity not justified when "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand").

Here, there is little doubt under the caselaw at the time of the entry that Deputy Smith was violating the Madrugas' Fourth Amendment rights. Cases as far back as 1964 clearly stated that entry onto the normal causeways to and from the

home's front door were subject to encroachment by the police only if the officers had "an honest intent" to talk to the home's occupants. Here, Deputy Smith himself candidly acknowledged that at the time he passed through the wall's gate into the courtyard his intent was not to talk to Madruga but to detain and hold him there until Deputy Clark arrived.

The point about the enhanced nature of the curtilage surrounding the Madrugas' home is less amenable to the typical method for resolving qualified immunity. The Court has been unable to find, and the parties have not submitted, any case involving an officer encroaching upon a home's curtilage unannounced for purposes of a knock and talk when the homeowner has taken measures to deny admittance to the curtilage for such a purpose. That said, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); *see also Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful"). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has not previously been held unlawful.'" *Hope,* 536 U.S. at 741, 122 S.Ct. 2508 (quoting *United States v. Lanier,* 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)).

Here, it would be obviously clear to a reasonable officer that the common assumption of being able to approach a home's front door unannounced did not apply. As far back as 1964 in *Davis,* the Ninth Circuit stated that use of the knock and talk technique must give way when the officer is presented with circumstances demonstrating "express orders from the person in possession against any possible trespass." This rule of law applied with obvious clarity on the night of August 5, 2000, when Deputy Smith stood outside the front of the Madrugas' residence. A large, solid wall ran across the front, side, and rear to the house. The wall was so tall that a passerby would not have been able to see what took place within the interior courtyard absent taking some extraordinary measure such as climbing atop the wall. Access through the wall into the front yard was barred by two equally large solid wooden gates. Each gate was closed, which only furthered the impression that the area beyond the wall was not to be encroached upon absent permission from the homeowner. Capping all of this off is the presence of a large sign warning the observer that guard dogs lie beyond the wall.

If such measures are not enough to have given an obvious and clear meaning to any onlooker against "any possible trespass" over the courtyard, the Court cannot think of what else (save for truly cost prohibitive measures not within the means of most citizens) the Madrugas could have done to make the message any more clear. Would they have had to build an even taller wall, perhaps one over ten-feet tall to make the message more clear and obvious (assuming that such a height would be permitted by applicable building codes)? Perhaps rather than one sign warning about the presence of guard dogs, the Madrugas would have to plaster the entire wall with signs telling people to keep away. The Madrugas need not have to patrol their courtyard in order to ensure that the privacy they seek to secure with the erection of the wall, gates, and signs is maintained. *See On Lee,* 193 F.2d at 314 (Frank, J., dis-

senting)("A man still has the right to be secure in his home[; ...] He does not have to keep up a 24–hour watch against official invaders"). Other then truly making their home a castle of old, the Court cannot envision a set of circumstances that would more clearly and obviously communicate a homeowner's intentions for others to keep away than those in this case. A picture is worth a thousand words. Any reasonable officer who was confronted by what is depicted in the picture on exhibit 68 would surely have realized that the homeowner did not wish nor expect for persons to show up at their front door unannounced. That the Court (nor the parties) cannot find a case from on or before the same time period making this point could just as well prove the extraordinariness of the measures the Madrugas took to secrete their courtyard from intrusion. Most homeowners after all, save those perhaps in certain fenced or secreted communities, do not go about seeking to transform their front yard into a cloistered sanctuary. *See Redmon,* 138 F.3d at 1130 (Posner, C.J., dissenting)("The curtilage would rarely extend beyond the house itself if complete, opaque enclosure were required. Few people, other than the very wealthy, barricade their front yard so completely that a person seeking to enter must request the unlocking of a solid gate that is higher than eye level"). That the Madrugas did so only reinforces the obviousness of the message they were sending to any would-be visitor: Keep away unless we have given you permission to enter our courtyard. Simply put the measures taken by the Madrugas to shield their courtyard from intrusion were precisely the "significant and precise demonstrations of an owner's intent to exclude members of the public from his/her premises" called for by the rule announced in *Davis.* Deputy Smith's failure to understand or heed this message is not a mistake even a reasonable officer confronted with similar circumstances would have made.

Defendants have cited to a number of cases in support of affording Deputy Smith qualified immunity, commenting that those cases presented "very closely analogous circumstances" to this case. (Opp. at 12). Far from it. In none of those cases did the officers involved have an intent other than to talk to the home's occupants. *See United States v. Martinez–Ruiz,* 16 Fed. Appx. 783, 784 (9th Cir.2001)(officers proceeded to front door to talk to occupants after "smelling marijuana" as they passed by home); *United States v. McCullough,* 1994 WL 171170 *1 (9th Cir. May 5, 1994)("the officers were attempting to contact the occupants"); *United States v. Hall,* 1998 WL 382722 *1 (9th Cir. June 3, 1998)(officers sought to talk to occupants regarding a tip the officers received that marijuana was being grown on the occupants property); *Edens,* 112 Fed.Appx. at 873–75 (officers went to "talk to the homeowner" to discuss a tip the officers received that "several marijuana plants were in portable containers outside the residence"). Nor in any of those cases, save one, did the homeowners come anywhere close to taking the extensive measures to exclude others from walking up to their front door unannounced as the Madrugas did in this case. While the *Edens* case does possess similar facts to the present with respect to the enhancement to the curtilage—the homeowner placed a fence with a locked gate around three sides of the house along with no trespassing signs—the Court disagrees with that court's conclusion that qualified immunity should be afforded to the officer involved due to the absence of a single case "that squarely supports [plaintiff's] claim." 112 Fed.Appx. at 876. As noted earlier, qualified immunity is unavailable, even in the absence of factually indistinguishable cases, if application of a general rule of law would apply with obvious clarity to the

situation the police officer confronted even if the factual scenario was novel. That is precisely what Deputy Smith was presented with as he stood outside the wall surrounding the Madrugas' residence.

Accordingly, the Court finds that Deputy Smith's intrusion into the home's curtilage violated the Fourth Amendment. The defendants' motion for summary judgment is therefore **DENIED** and plaintiffs' motion for summary judgment is **GRANTED** insofar as it relates to Deputy Smith unlawful entry into the curtilage to the home.

IT IS SO ORDERED.

ADDENDUM